66 A.3d 192

FRANK CAMINITI, APPELLANT, v. BOARD OF TRUSTEES,
POLICE AND FIREMEN'S RETIREMENT SYSTEM,
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 9, 2012—Decided May 30, 2013.

Before Judges FUENTES, GRAVES, and KOBLITZ.

*Steven J. Kossup* argued the cause for appellant.

*Jeff S. Ignatowitz* argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Mr. Ignatowitz,* Deputy Attorney General, on the brief)

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Appellant Frank Caminiti appeals, for the second time, the decision of the Board of Trustees of the Police and Firemen's Retirement System (Board) denying his application for accidental disability benefits. In the first appeal, *Caminiti v. Board of Trustees, Police & Firemen's Retirement System,* 394 *N.J.Super.* 478, 927 *A.*2d 560 (App.Div.2007), the Board referred the matter to the Office of Administrative Law (OAL), where an administrative law judge (ALJ) conducted an evidentiary hearing and issued an initial recommendation to deny appellant's application for accidental disability benefits. *Id.* at 481, 927 *A.*2d 560. The Board adopted the ALJ's initial recommendation, and, on appellant's direct appeal to this court, we affirmed the Board's decision. *Id.* at 480, 927 *A.*2d 560.

While appellant's petition for certification appealing our decision was pending, the Supreme Court decided *Patterson v. Board of Trustees, State Police Retirement System,* 194 *N.J.* 29, 942 *A.*2d 782 (2008), and *Richardson v. Board of Trustees, Police & Firemen's Retirement System,* 192 *N.J.* 189, 927 *A.*2d 543 (2007), two landmark cases that changed the legal standard for determining eligibility to receive accidental disability benefits, whether caused by physical injury or by purely mental stressors. As a result, appellant's case was remanded so that the Board could reconsider his application in light of the standards established by *Patterson* and *Richardson.*

On remand, the Board again denied appellant's application, ostensibly based on the standards of review adopted by the Court in *Patterson* and *Richardson.* This time, however, the Board rejected the ALJ's recommendation to grant appellant accidental

disability benefits. Undaunted, appellant once again appeals the Board's decision to this court. While his second appeal was pending before this court, our Supreme Court decided *Russo v. Board of Trustees, Police & Firemen's Retirement System*, 206 *N.J.* 14, 17 *A.*3d 801 (2011), in which the Court reversed the Board's decision to deny a petitioner accidental disability benefits. *Id.* at 35, 17 *A.*3d 801. In *Russo*, the Court held that the Board had misapplied the standards established in *Patterson* and *Richardson. Id.* at 33, 17 *A.*3d 801. Writing for the unanimous Court, Justice Long noted:

> In this case, the member, a policeman, was involved in a terrifying fire rescue in which he was injured and the victim died. He applied for accidental disability benefits and, according to the Board ..., satisfied Richardson and experienced a *Patterson*-type horrific event. Despite that, the Board denied accidental disability benefits on the ground that, although the member experienced a qualifying "horror-inducing event," the event was "inconsequential" and "not objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." That determination, which was affirmed by the Appellate Division, was an improper application of *Patterson*, in which we declared that a qualifying traumatic event is, in itself, objectively capable of causing a reasonable person to suffer permanent mental injury. Thus, the Board erred in denying the member accidental disability benefits.

> [*Id.* at 18–19, 17 *A.*3d 801 (citation omitted).]

In this appeal, appellant now argues that the Board's decision in his case was arbitrary and capricious and, as was the case in *Russo,* misapplied the standards established by the Supreme Court in *Patterson* and *Richardson.* We agree with appellant's position and reverse. The Board's denial of his application for accidental disability benefits mischaracterized the factual record and was predicated on an incorrect application of the prevailing legal standards.

Although we provided a summary description of the salient facts and procedural history of this case in appellant's first appeal, *Caminiti, supra,* 394 *N.J.Super.* at 480–81, 927 *A.*2d 560, we will nevertheless elaborate and expand upon the events that triggered this protracted legal saga. Our intent in doing so is to give a meaningful factual context to our legal analysis. These facts are

derived from the testimony and evidence presented to the ALJ at the first evidentiary hearing.

## I

Appellant joined the Essex County Sheriff's Department in 1986. He also worked with the County's emergency services unit as a certified fire investigator and canine trainer. This required him to respond to incidents involving shootings, fire investigations, and bomb threats. On January 20, 2000, appellant was dispatched with his trained police dog to the campus of Seton Hall University in the Township of South Orange to investigate a major fire that had occurred the previous day; a student dormitory had been set ablaze, causing the death of three resident students and injuring many others.

As he drove through the South Mountain Reservation, he saw a vehicle in a parking area with its front hood, trunk, and both doors open and a man walking towards the woods. Simultaneously, he heard a radio call reporting that a man was in the area attempting to commit suicide. As he tried to notify dispatch of his observations, a second radio call reported that this same individual was threatening a police officer with a tire iron.

Appellant parked his vehicle on the road and walked toward the Reservation area. He soon saw a man "swinging a tire iron wildly in the air," beating the top of a car, and reaching inside through the open doors to hit the dashboard. He also saw a Maplewood police car and an officer he recognized as a Maplewood police lieutenant.

Appellant radioed the license plate number of the car the man was hitting and was informed that it was registered to B.R.[1] B.R. was swinging the tire iron in the air, shouting profanities, and threatening to "kill ya's." Appellant began talking to B.R. in an

---

[1] We use initials because the identity of an apparent mentally ill individual is not relevant to our discussion.

attempt to calm him down. His efforts proved to be ineffectual however, because B.R. continued to yell obscenities and "started to come at [appellant]." When B.R. was about four feet away, appellant drew his service weapon with one hand and put up the other hand to signal B.R. to stop his advancement. Believing that his life was in danger, appellant started to retreat. At one point, B.R. swung at appellant, but eventually stopped advancing towards him.

Appellant testified that, for the first time in his career, he feared he would have to discharge his weapon and possibly kill someone. As his finger began to pull the trigger, he stopped and continued to retreat further because he also feared he would inadvertently shoot the Maplewood lieutenant who was standing nearby. Appellant gave the following description of his thought process at the time:

> I'm moving pretty ... quickly backward, but I'm—also mindful that the grass has a little bit of snow on it and I'm on the berm and I'm afraid—I'm thinking about, "Oh, if I fall, he's got the jump on me."
>
> . . . .
>
> I thought ... if he possibly got close enough that he hit me in the head or disabled me, that he could—in his state of mind, he could take my—my weapon and either use it on me or on the other officer or himself or anybody walking through that park at that—walking their dog in that park through that hour.
>
> . . . .
>
> I'm in a tunnel vision. Everything just started to go slow. I really felt I was going to have to shoot [B.R.] and I was—I was very nervous.

Although B.R. remained standing in one place, his mood changed "from second to second," and his mental state appeared unstable: "One minute he was saying that he was going to kill [appellant] or hurt [someone else] and the next minute he was saying, 'Oh, you're going to hurt me.' "

When appellant radioed for additional units, B.R. advanced towards him for a second time. At this point, Maplewood Police Officer Jimmy Devaul and another Essex County Sheriff's Officer, Kamal Brown, arrived as back up. Devaul drew his weapon because he feared B.R. would throw the tire iron at him or lunge

at him using it as a weapon.[2]  The Maplewood officer, who was farther away from B.R. than appellant, used his car door as a barricade.

As B.R. began to walk across the parking lot away from the officers, appellant holstered his weapon and took out his pepper spray canister.  Unexpectedly, B.R. turned around and began to walk towards appellant.  Appellant again asked B.R. to put down the tire iron.  At first, B.R. seemed responsive to the command. He threw the tire iron on the ground and slumped over.  He then "all of a sudden out of nowhere raged up again," turned towards Officer Brown, who is African–American, made a racial comment, and reached out to pick up the tire iron.  Appellant testified that he believed that B.R. was going to strike Brown with the tire iron. Appellant jumped on B.R.'s back and tackled him to the ground, while Brown kicked the tire iron away from B.R.'s reach.

Appellant handcuffed B.R. and placed him against his vehicle with his head resting on top of the roof in order to search him. B.R. remained uncooperative and "wouldn't stay still."  Appellant asked B.R. whether he had any weapons on his person or anything else that could injure appellant.  When B.R. responded that he did not have anything dangerous on his person, appellant bent down to search B.R.'s legs and lower-torso.  According to Devaul, as appellant rose to search B.R.'s upper body, B.R.'s chest and upper body "came off the car," and he turned "very quickly" towards appellant.[3]

B.R. was wearing a long-sleeve cotton shirt.  When appellant backed up and raised his hand to defend himself, a needle that had been laying sideways in B.R.'s shirt pocket pierced appellant's middle finger from the bottom through to the nail.  Appellant pushed B.R. away and the needle, which remained in B.R.'s shirt,

---

[2] Devaul testified that he would have shot B.R. if he had faced the circumstances that appellant experienced before his arrival.

[3] When asked to demonstrate B.R.'s movements to the ALJ, Devaul "got up from his chair and he moved his left shoulder backwards."

came out of appellant's finger. B.R. immediately apologized, saying: "I'm sorry. I just used it. I forgot.... [D]on't worry. I don't have AIDS."

Appellant had been trained to protect himself from blood borne pathogens and the transmission of HIV and AIDS. He testified that at that moment he thought: "Oh, man. This guy just signed my death certificate." He became "very upset" and "wasn't in [his] right mind." He thought of his children and how to tell his wife. Other officers took appellant aside and attempted to squeeze the blood out of his finger. A supervisor told appellant that B.R. had "track marks all up and down his arms" and ordered appellant to go to St. Barnabas Hospital.

Appellant described what occurred when he arrived at the hospital:

> The doctor sat me down, asked everybody to leave the room and sat down and said, "Look, this is a—a serious thing. You got stuck with a—a drug user's needle and you need to take some precautions now.... There's no way I can tell right now whether you're infected or not." He went through that whole thing with me. He said it's too soon. He said there's always a chance that something can happen. He said, "So I'm prescribing you" ... four different medication and "We don't know for sure that these things work, but it's standard practice. We call it the AIDS cocktail, that if you take this medicine, it could possibly prevent you from contracting AIDS." He said "could possibly." I said is—and he said, "No. I'm telling you could possibly."

Appellant testified that he became very emotional and began to cry. He "felt that [his] whole world had just caved in." The doctors told him "not to have any saliva contact with [his] children for at least six months" and to avoid all sexual relations with his wife until after he had had two negative HIV tests.

A fellow officer drove appellant home that day; another officer, who had not been at the scene, wrote the incident report because it had to be submitted before the end of appellant's tour of duty that night. The report made no mention of the tire iron or that appellant had drawn his service weapon. Appellant signed the report that night after it was delivered to his home. Appellant described the scene at his home as "an emotional evening" with his wife crying while his children were kept from knowing what

had taken place. Appellant "couldn't think straight" and wanted nothing to do with "anything that had to do with work."

The doctors told him that the AIDS cocktail of pills he was required to take would make him "deathly ill." He was constantly vomiting and became dehydrated. Eventually he obtained a prescription for a drug given to cancer patients to counteract the effects of chemotherapy and lessen the nausea. The medication also made him "jittery" and unable to concentrate.

The doctor's warning concerning the physical effects of the medications did not prepare him for the emotional and psychological trauma he experienced. He had "horrible thoughts" of suicide, suffered from insomnia and a general disturbance of normal sleeping hours, and his sleep was erratic and sporadic. The brief periods of sleep he had involved mostly nightmares, distorted images of B.R. coming at him with the tire iron. He was unable to concentrate or to read even small amounts of information.

After being home for a few days, he was ordered to see the County's physician. This doctor told him to go back to work, even after appellant told him about the vomiting. Appellant had vomited twice while in the waiting room. Despite these symptoms, appellant was denied the right to receive "injured on duty time." Although he returned to work as ordered, he was initially assigned to office duty. When he returned to the field, he "tried to work things out," but he would make excuses to avoid searching suspects and eventually began to "just park somewhere and try to avoid ... things that [he] could avoid." In the meantime, his emotional and psychological condition continued to deteriorate:

[T]hings just progressively got worse at work. I got into other high [sic] incidents where there was shootings and this and that and we would grab the perps and I'd be the only one standing there with the guy and it would be my job to search him and I just got to the point where I realized, I said, "One of two things is going to happen here. I'm going to either hurt myself because ... I'm not searching these people. I'm afraid and I'm not admitting to myself that I'm afraid or I'm going to get another guy hurt," and I would hate to see that happen.

He developed hypertension, describing his blood pressure as "sky high"; he became irritable and contentious during routine

family matters. His mental and emotional state in matters concerning his family improved after he began treatment with Dr. William R. Lutz of the Montclair Counseling Center. However, he continued to be apprehensive about responding to potentially dangerous incidents that could arise as part of his duties with Essex County's emergency services unit.

## II

Appellant retired from the Essex County Sheriff's Department on April 1, 2004. Thereafter, he received numerous offers to do bomb searches with his trained dog. Despite the opportunity to supplement his income, he declined to accept any of these job offers. He did not want to upset his family or increase or change the medication he was already taking. At the time of the first hearing date before the ALJ, appellant was taking hypertension medication and Paxil for anxiety.

The Board retained Dr. Howard A. Layman to examine appellant, review his treatment records, and report his findings to the Board. In a report dated November 15, 2003, Dr. Layman made the following findings with respect to appellant's injuries and their emotional and psychological ramifications:

> On January 20, 2000, [appellant] directly experienced a traumatic event that involved actual or threatened death or serious injury, or other threat to his physical integrity. Following the needle stick injury, [appellant] immediately believed that he was infected with HIV and would develop AIDS and die.
>
> [Appellant] experienced the injury with intense fear, terror, and helplessness. He stated that he had to remove himself from the scene because he was fearful that he might shoot the suspect.
>
> [Appellant]'s feelings of intense fear, terror, and helplessness intensified after the Emergency Department physician instructed him to abstain from sexual relations with his spouse and avoid saliva contact with his children.
>
> [Appellant]'s intrusive recollections, nightmares, flashbacks, hypervigilance, and avoidant [sic] are specifically related to the job-related traumatic incident on January 20, 2000.
>
> [Appellant] did not evidence symptomatology consistent with the diagnosis of Post–Traumatic Stress Disorder prior to the job-related traumatic incident on January 20, 2000.

Prior to the onset of his present illness, [appellant] demonstrated a history of good pre-morbid social and occupational function. There is no past personal or family history of documented psychiatric illness. This is no history of alcohol or other substance abuse or abuse.

Dr. Layman concluded that appellant's disability "was directly and causally related to the job-related traumatic incident on January 20, 2000."

Against this background, appellant sought accidental disability benefits pursuant to *N.J.S.A.* 43:16A–7(1), which provides that a member of the Police and Firemen's Retirement System,

may be retired on an accidental disability retirement allowance; provided, that the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

The ALJ assigned to the case denied appellant's application. Construing eligibility to receive benefits under *N.J.S.A.* 43:16A–7, the ALJ applied the then prevailing legal standard in the form of a three-prong test established by the Supreme Court in *Kane v. Board of Trustees, Police & Firemen's Retirement System*, 100 *N.J.* 651, 663, 498 *A.*2d 1252 (1985). The Board adopted the ALJ's initial decision. In our opinion reluctantly affirming the Board's decision, we noted the elusiveness of the traumatic event standard established by *Kane* and the lack of a "uniformly workable basis" that would allow the outcome of a typical case to be predicted with confidence. *Caminiti, supra,* 394 *N.J.Super.* at 482–83, 927 *A.*2d 560.

Less than two weeks after our decision was released, the Supreme Court decided *Richardson, supra,* 192 *N.J.* 189, 927 *A.*2d 543. Citing the "confusion" and irrationality of the body of law generated by the application of the *Kane* test, *id.* at 205–09, 927 *A.*2d 543, the Court established the following criteria for determining what type of circumstances would satisfy the traumatic event standard of *N.J.S.A.* 43:16A–7:

[T]o obtain accidental disability benefits, a member must prove:

 1. that he is permanently and totally disabled;

 2. as a direct result of a traumatic event that is

 a. identifiable as to time and place,

 b. undesigned and unexpected, and

 c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

 4. that the disability was not the result of the member's willful negligence; and

 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[*Richardson*, *supra*, 192 *N.J.* at 212–13, 927 *A.*2d 543.]

By order dated September 25, 2007, the Supreme Court granted appellant's motion to remand his case to the Board for reconsideration in light of Richardson. Anticipating the release of additional Supreme Court decisions on the same issue, the Board decided to delay acting upon the Court's order to reconsider appellant's case.[4]

On March 11, 2008, the Supreme Court decided three cases, consolidated under *Patterson*, *supra*, 194 *N.J.* 29, 942 *A.*2d 782, in which the Court held:

[T]o obtain accidental disability benefits for a mental injury precipitated by an exclusively mental stressor, a member must satisfy the standards in Richardson. In addition, the disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person.

[*Id.* at 50, 942 *A.*2d 782.]

---

[4] The Board's decision "to postpone action regarding [appellant]'s application," as ordered by the Supreme Court, is memorialized in a letter dated November 20, 2007, from the Board's Secretary to appellant's counsel. From the record before us, the Board made this decision without even attempting to first seek leave from the Court to delay the reconsideration of appellant's case. Although we presume the Board acted in good faith, we nevertheless expect all litigants, especially public entities, not to arrogate to themselves the power to choose when it will comply with an order from the Supreme Court. Here, the Board should have sought leave from the Court before deciding to adopt this presumed well-intended, yet legally misguided position.

After *Patterson* was decided, the Board acted on the Court's remand order and found that appellant had met all of the Richardson factors. The Board "determined that the incident of January 20, 2000, was identifiable as to time and place and was undesigned and unexpected and caused by a circumstance external to the member and not the result of pre-existing disease that was aggravated or accelerated by the work." It determined, however, that under the *Patterson* standard appellant was not entitled to accidental disability "because the physical injury of the needle stick was resolved" and the sole basis for the disability was "psychological trauma from fear of infection." According to the Board, *Patterson* required that "the event must be objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury."

Applying this standard, the Board found that the event and related emotional trauma experienced by appellant did not rise to the level of a "terror-horror inducing event." The Board made the following findings in support of this conclusion.

[Appellant] applied for accidental disability on June 23, 2003, for an incident that occurred on January 30, 2000, a period of time long past the six month window of determining whether there had been exposure. No evidence was presented to the Board that the needle was infected. The evidence before the Board indicates that prophylactic treatment was undertaken to reduce risks and he has not contracted a disease. Therefore, the Board finds that continuing emotional distress arising from a fear of possible infection beyond the six month period when there is no medical indication of continuing risk is not reasonable and is idiosyncratic.

Following this decision, appellant argued before an ALJ that the Board's application of the *Patterson* analysis was improper because his case should have been decided according to the Richardson criteria, although the incident satisfied both standards. He argued that the Board improperly applied a "reasonable person" standard that did not exist in the Richardson criteria.

Although the deputy attorney general representing the Board conceded that the circumstances experienced by appellant met the Richardson factors, he argued that the question of accidental disability had to be decided under *Patterson:* "If you are stuck with a needle and you can no longer shoot your weapon, that's a

Richardson case. If you're stuck with a needle and you're psychiatrically disabled, that's a *Patterson* case." After hearing from appellant and expert witnesses from both sides, the ALJ concluded that appellant qualified for accidental disability because, as a reasonable sheriff's officer in 2000, he could have suffered a qualifying trauma. The Board modified the ALJ's factual findings, rejected her conclusions that the incident of January 20, 2000, was considered a traumatic event under *N.J.S.A.* 43:16A–7 and relevant case law, and denied appellant's application.

### III

Appellant now argues that the Board's denial of his claim should be reversed because it incorrectly required him to satisfy the *Patterson* standard rather than the factors in *Richardson*, which the Board admitted were met under these circumstances. We agree. The *Patterson* standard is inapplicable where a petitioner suffers both a physical and psychiatric injury.

Judicial review of an agency's final decision is generally limited to a determination of whether the decision is arbitrary, capricious, or unreasonable or lacks fair support in the record. *Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 198 *N.J.* 215, 223, 966 *A.*2d 1020 (2009). We also recognize that state agencies possess expertise and knowledge in their particular fields. *Ibid.* This deference, however, does not extend to the agency's interpretation of a statute or other strictly legal issue, including case law. *Russo, supra,* 206 *N.J.* at 27, 17 *A.*3d 801; *In re Carter,* 191 *N.J.* 474, 483, 924 *A.*2d 525 (2007). We do not defer to an agency's interpretation of a statute when it is inaccurate or undermines the Legislature's intent. *Russo, supra,* 206 *N.J.* at 27, 17 *A.*3d 801. In this case, the Board misapplied the case law that interpreted the statutory standard for determining eligibility to receive an accidental disability pension.

A member of the Police and Firemen's Retirement System may be retired on an ordinary disability service allowance upon certification by the medical board that the member "is mentally or

physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him and that such incapacity is likely to be permanent and to such an extent that he should be retired." *N.J.S.A.* 43:16A–6(1).

A member may receive a substantially higher allowance for an accidental disability retirement upon certification by the medical board that a member,

> *is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties* and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
>
> [*N.J.S.A.* 43:16A–7(1) (emphasis added).]

The original version of this statute provided an enhanced pension upon certification "that the natural and proximate cause of such disability was an accident met in the actual performance of duty." *L.* 1944, *c.* 255, § 7. Judicial decisions eventually expanded the statute's definition of "accident" from the concept of mishaps, such as trips, falls, and motor vehicle collisions, to encompass heart attacks precipitated by ordinary work effort. *Fattore v. Police & Firemen's Ret. Sys.*, 80 *N.J.Super.* 541, 550–51, 194 *A.*2d 363 (App.Div.), *certif. denied,* 41 *N.J.* 245, 196 *A.*2d 6 (1963). This interpretation brought the statute's concept of "accident" more in line with how that term was employed in workers' compensation law. *Id.* at 549–50, 194 *A.*2d 363. In response, in 1964 the Legislature amended the statute to replace the term "accident" with the phrase "traumatic event." *L.* 1964, *c.* 241, § 4; *Richardson, supra,* 192 *N.J.* at 199, 927 *A.*2d 543.

For the next twenty years, the courts struggled with the proper application of the "traumatic event" language. *Kane, supra,* 100 *N.J.* at 662, 498 *A.*2d 1252. Twenty-two years after *Kane,* the Court decided to revisit the legal standard for determining whether an incident qualified as a "traumatic event" under the statute. *Richardson, supra,* 192 *N.J.* at 192, 927 *A.*2d 543. The Court's

objective was to return to the Legislature's intention when it adopted the "traumatic event" language in *N.J.S.A.* 43:16A–7. *Id.* at 212, 927 *A.*2d 543.

The following year, the Court again addressed the issue of what constitutes a "traumatic event" for purposes of an accidental disability pension. *Patterson, supra,* 194 *N.J.* at 33, 942 *A.*2d 782. This time the Court sought "to determine whether an applicant who has suffered a permanent mental disability as a result of a mental stressor, without any physical impact, can be considered to have experienced a 'traumatic event' and, if so, what standard should apply in assessing such a claim." *Ibid.* The Court concluded that a "permanent mental injury caused by a mental stressor without any physical impact can satisfy the Richardson standard." *Id.* at 48, 942 *A.*2d 782.

The Court rejected the pension board's contention "that an exclusively psychological stressor cannot be a traumatic event." *Ibid.* It acknowledged, however, that the boards were legitimately concerned that they not become "bogged down in litigation over idiosyncratic responses by members to inconsequential mental stressors." *Id.* at 48–49, 942 *A.*2d 782. The Court recognized that in cases of physical injury the medical analysis extends beyond the individual's subjective complaints to clinical and laboratory tests, but proof of the causal relationship between an event and psychological injury may be more problematic. *Id.* at 48, 942 *A.*2d 782.

The Legislature's establishment of criteria for the kind of "critical incidents" that required law enforcement personnel to participate in crisis intervention counseling programs indicated the nature of a traumatic event that could be expected to produce mental injury. *Id.* at 49, 942 *A.*2d 782; *N.J.S.A.* 40A:14–196. These events included, but were not limited to:

> the firing of a weapon or an exchange of gun fire; serious bodily injury to or the death of a juvenile; a terrorist act; a hostage situation; serious bodily injury to or the death of another law enforcement officer employed in the same agency, when that serious bodily injury or death occurred in the performance of that officer's

official duties; a personal injury or wound; [and] serious bodily injury received in the performance of the officer's official duties.
[*Patterson, supra,* 194 *N.J.* at 49, 942 *A.2d* 782 (alteration in original) (quoting *N.J.S.A.* 40A:14–196(b)).]

The Court also looked to the diagnostic criteria for PostTraumatic Stress Disorder in the DSM–IV–TR, the handbook published by the American Psychiatric Association, which recognized the existence of a causal relationship between threatening traumatic events and mental disorders. *Ibid.* The criteria required that the individual,

has been exposed to a traumatic event in which both of the following were present:

(1) the person experienced, witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others

(2) the person's response involved intense fear, helplessness or horror.
[*Ibid.* (citation omitted).]

These elements are consistent with the Legislature's approach in *N.J.S.A.* 40A:14–196. *Patterson, supra,* 194 *N.J.* at 49, 942 *A.*2d 782. The effect of this "limitation" would be to "require the traumatic event to be objectively capable of causing a permanent, disabling mental injury." *Id.* at 49–50, 942 *A.*2d 782. Recovery for accidental disability is limited to stressors that are "sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances." *Id.* at 50, 942 *A.*2d 782. The new requirements for a member "to obtain accidental disability benefits for a mental injury precipitated by an exclusively mental stressor" requires the member to satisfy the *Richardson* factors, and "[i]n addition, the disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." *Ibid.*

In *Patterson,* the Court applied the new standard to three cases, all of which involved individuals who claimed psychological harm from purely verbal threats. *Id.* at 34–42, 942 *A.*2d 782. The first, Robert Patterson, was a New Jersey State Police (NJSP)

Officer who had been charged with domestic violence for breaking his girlfriend's nose. *Id.* at 34, 942 *A.*2d 782. The Officer was chastised with profane language by his sergeant in the presence of fellow officers and told to leave the building. *Id.* at 35, 942 *A.*2d 782. He believed the sergeant would have struck him if he had failed to comply. *Ibid.* As a result of this mistreatment by the sergeant, Patterson was ostracized by his peers, became depressed, lost interest in improving himself, and felt physically ill on the days he had to report to work. *Ibid.* The Court found that the conduct of Patterson's superiors failed to overcome the traumatic event threshold because "it simply did not involve actual or threatened death or *serious* injury to Patterson's physical integrity." *Id.* at 51, 942 *A.*2d 782.

In the second case, Glynn Moore, an African–American NJSP Officer, sought accidental disability benefits based on mental disabilities he sustained as a result of "prolonged exposure to a racially hostile work environment." *Id.* at 36–37, 942 *A.*2d 782. The Court found that "prolonged exposure" clearly failed to meet the traumatic event requirement as that term had been defined for purposes of accidental disability pensions. *Id.* at 51, 942 *A.*2d 782.

The Court's analysis focused on two specific incidents of racially motivated violence or mistreatment witnessed by Moore. *Id.* at 51–52, 942 *A.*2d 782. The first incident occurred fourteen years before Moore filed his pension application. *Id.* at 52, 942 *A.*2d 782. According to Moore, he was traumatized when he saw his fellow officers unjustifiably beat an African–American woman who had been in a car accident. *Id.* at 36–37, 942 *A.*2d 782. Moore did not report the incident beyond telling his sergeant, whom Moore claimed told him to ignore it. *Id.* at 52, 942 *A.*2d 782. Under these circumstances, the Court refused to "reward" Moore's dereliction of duty by allowing the incident to provide the basis for an enhanced public pension. *Ibid.*

The second incident involved death threats that occurred nine or ten years before Moore filed his pension application. *Ibid.* This incident was barred from consideration under the statute of

limitations applicable to state police pensions, which requires proof that the mental disability was a direct result of an incident that occurred within the previous five years. *Ibid.* Despite these deficiencies, the Court remanded the matter because two physicians had been precluded from testifying on the issue of delayed manifestation of symptoms. *Ibid.*

The third applicant, Corrections Officer Joseph Guadagno, claimed that he had received specific threats of rape and murder of his wife and daughter by an inmate who knew details of Guadagno's personal life. *Id.* at 38–39, 942 *A.*2d 782. This inmate was allegedly affiliated with a gang that the inmate claimed was capable of carrying out the threats. *Id.* at 39, 942 *A.*2d 782. Guadagno learned that the inmate had been visited by an individual who lived in the town next to where Guadagno lived. *Ibid.* Guadagno began to suffer panic attacks, had marital problems, and became afraid of responding to emergency alarms at the prison. He used all of his sick and vacation time because he was afraid to report to work. *Id.* at 39–40, 942 *A.*2d 782.

The Board agreed that Guadagno was permanently disabled as a result of the threats. *Id.* at 40, 942 *A.*2d 782. The Board nevertheless rejected his application for accidental disability benefits. *Ibid.* It found the situation experienced by Guadagno did not constitute a traumatic event. *Ibid.* On appeal, the Court held that a credible threat of rape and murder by a presumed gang member, who knew where the petitioner lived, could be deemed a traumatic event under the statute. *Id.* at 53, 942 *A.*2d 782. The Court remanded the matter for reconsideration pursuant to the framework set forth in *Richardson* and *Patterson.* *Ibid.*

### IV

Here, appellant argues that the Board's imposition of the *Patterson* standard was incorrect because he suffered physical trauma that required medical treatment which "brings this case out of the category of 'exclusively psychological trauma'" and within the parameters of Richardson. In contrast to the cases reviewed in

*Patterson,* appellant emphasizes that he suffered an actual physical injury in the form of an intrusion into his body by a hypodermic needle, which given its recent use by a self-confessed drug addict, gave him an objectively reasonable basis to believe he was probably infected with a virus that the medical community at the time viewed as being inescapably lethal.

In its decision, the Board acknowledged that "being pricked by a needle met the requirements of the Richardson test." On appeal, it does not address which test applies, contending that the only issue on appeal "is whether being pricked by a needle qualifies as a traumatic event under the *Patterson* test."

As a threshold issue, we disagree with the Board's characterization of what appellant experienced as merely "being pricked by a needle." We also reject the Board's dialectical approach to resolving the ostensible tension between *Patterson* and *Richardson.* The Richardson factors explicitly allow a member to qualify for accidental disability benefits based on being "mentally *or* physically incapacitated" as a result of a traumatic event. *Richardson, supra,* 192 *N.J.* at 213, 927 *A.*2d 543 (emphasis added). At no point in the Court's discussions in either *Richardson* or *Patterson* did the Court restrict the application of Richardson to members who became only physically incapacitated from doing their jobs.

The Richardson method of evaluation recognizes that a traumatic incident may cause a member to suffer a physical injury that eventually heals completely, while leaving a concomitant psychological injury that prevents the member from performing his or her job. A police officer who is shot in the arm while performing his or her duty may fully recover the use of his or her limb, while simultaneously enduring a residual psychological trauma that manifests itself into an inability to engage in physical confrontations involving the potential use of firearms. Such a psychic injury could impede the officer's reactions while on duty and endanger himself or herself, fellow officers, and the public at large. The Board's interpretation of *Patterson* leaves no room for

its application to these scenarios and is, therefore, unsustainable as a matter of law.

The Board's insistence that appellant must meet the additional *Patterson* requirement ignores or undervalues that appellant underwent extensive medical treatment for the injury he received. The drugs he received were not prescribed to treat any mental health symptoms. Instead, appellant's physical status, arising out of the incident, warranted a medical response to combat potential physical implications. The treatment created specific, medically anticipated, and extremely harsh effects on his body that were similar to the effects experienced by cancer patients who undergo chemotherapy after surgery. Indeed, appellant eventually was prescribed the same ameliorative drugs given to patients undergoing chemotherapy treatment.

This was not an officer who accidentally stuck himself on a straight pin while frisking a suspect's clothes and was treated with a band-aid or experienced a minor infection at the site. To the contrary, the medical effect of the event was comparable to the experience of surgical intervention or extended hospitalization. It triggered serious bouts of pharmacological intervention and a prolonged period of physical discomfort and recovery. Simply stated, the record does not support the Board's finding that appellant's physical injury was "minor."

Here, the Board misinterpreted and misapplied the Court's decisions in *Richardson* and *Patterson.* Appellant's disability was not precipitated by "an exclusively mental stressor." *Patterson, supra,* 194 *N.J.* at 50, 942 *A.*2d 782. In addition to the physical impact of the potentially lethal needle prick, appellant endured many weeks of physical discomfort associated with the medications prescribed to prevent the transmission of HIV.

The Board's analysis should have ended with an application of the Richardson factors, which it acknowledged appellant had satisfied. The evidence in the record provided substantial support for that conclusion. This was a singular event that occurred at a specific time and place by an external force; it occurred within the

context of appellant's regular duties, it was not the result of appellant's negligence, and all of the experts, including the Board's own witnesses, found him to be mentally incapacitated from performing his duties as a result of the event.

V

The Board's decision denying appellant's application for accidental disability benefits pursuant to *N.J.S.A.* 43:16A–7(1) is reversed.