NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2825-22

M.R.,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

APPROVED FOR PUBLICATION

April 19, 2024

APPELLATE DIVISION

Argued March 6, 2024 – Decided April 19, 2024

Before Judges Accurso,[1] Vernoia, and Gummer.

On appeal from the New Jersey Department of
Corrections.

Colin Sheehan, Assistant Deputy Public Defender,
argued the cause for appellant (Jennifer Nicole Sellitti,
Public Defender, attorney; Colin Sheehan, of counsel
and on the briefs).

Christopher Josephson, Deputy Attorney General,
argued the cause for respondent (Matthew J. Platkin,
Attorney General, attorney; Sara M. Gregory,
Assistant Attorney General, of counsel; Christopher
Josephson, on the brief).

---

[1] Judge Accurso did not participate in oral argument.  She joins the opinion
with the parties' consent.  R. 2:13-2(b).

The opinion of the court was delivered by

GUMMER, J.A.D.

M.R. appeals from a final agency decision of the New Jersey Department of Corrections (DOC), denying his application for a certificate of eligibility for compassionate release under the Compassionate Release Act (CRA), N.J.S.A. 30:4-123.51e.[2]  M.R. contends the DOC's decision was arbitrary, capricious, and unreasonable because the physicians opining about his condition were required to but failed to physically examine him and failed to make requisite findings when determining M.R.'s medical eligibility for compassionate release.  We disagree and affirm.

I.

The Legislature enacted the CRA in 2020.  The CRA repealed an existing medical parole statute, formerly codified at N.J.S.A. 30:4-123.51c, and replaced it "with a streamlined process to apply for compassionate release."  A.M., 252 N.J. at 439-40; see also State v. A.M., 472 N.J. Super. 51, 58 (App. Div. 2022) (finding State commission recommended Legislature replace medical parole statute with a compassionate release statute having

---

[2]  We use initials to refer to M.R. because we discuss his medical condition. State v. A.M., 252 N.J. 432, 444-47 (2023) (finding "if a court details a defendant's medical condition in a compassionate release proceeding, it cannot identify the defendant by name").

similar standards "but with different procedural mechanisms intended to accelerate the decision-making process" (citing N.J. Crim. Sent'g & Disposition Comm'n, Annual Report:  November 2019 30-32 (2019))), aff'd as modified, 252 N.J. 432 (2023).

The CRA called on the Commissioner of Corrections to:

> establish and maintain a process by which an inmate may obtain a medical diagnosis to determine whether the inmate is eligible for compassionate release.  The medical diagnosis shall be made by two licensed physicians designated by the commissioner.  The diagnosis shall include, but not be limited to:
>
> (1) a description of the terminal condition, disease or syndrome, or permanent physical incapacity;
>
> (2) a prognosis concerning the likelihood of recovery from the terminal condition, disease or syndrome, or permanent physical incapacity;
>
> (3) a description of the inmate's physical incapacity, if appropriate; and
>
> (4) a description of the type of ongoing treatment that would be required if the inmate is granted compassionate release.
>
> [N.J.S.A. 30:4-123.51e(b).]

See also A.M., 252 N.J. at 440.

The Legislature defined a "[t]erminal condition, disease or syndrome" as "a prognosis by the licensed physicians designated by the Commissioner of

Corrections pursuant to subsection b. of this section that an inmate has six months or less to live."  N.J.S.A. 30:4-123.51e(l); see also A.M., 252 N.J. at 440.  It defined a "[p]ermanent physical incapacity" as a prognosis by the designated licensed physicians "that an inmate has a medical condition that renders the inmate permanently unable to perform activities of basic daily living, results in the inmate requiring 24-hour care, and did not exist at the time of sentencing."  N.J.S.A. 30:4-123.51e(l); see also A.M., 252 N.J. at 440.  "[T]he term 'activities of basic daily living' in N.J.S.A. 30:4-123.51e(l) includes eating, mobility, bathing, dressing, using a toilet, and transfers, and excludes instrumental activities such as shopping, house cleaning, food preparation, and laundry."  State v. F.E.D., 251 N.J. 505, 529 (2022).  To demonstrate a "'permanent physical incapacity'" under the CRA, an inmate must prove by clear and convincing evidence his medical condition "renders him permanently unable to perform two or more activities of basic daily living."  Id. at 531 (quoting N.J.S.A. 30:4-123.51e(1)).

"If an inmate is diagnosed with a terminal condition or permanent physical incapacity, the [DOC] 'shall promptly issue to the inmate a Certificate of Eligibility for Compassionate Release.'"  A.M., 252 N.J. at 441 (quoting N.J.S.A. 30:4-123.51e(d)(2)).  "With that certificate, the inmate 'may petition

4

the court for compassionate release' or ask the Public Defender to do so." Ibid. (quoting N.J.S.A. 30:4-123.51e(d)(2) to (3)).

## II.

In 2015, M.R. pleaded guilty to first-degree racketeering, N.J.S.A. 2C:41-2(c) and -2(d), and was sentenced to a sixteen-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Forty-years old, he currently has a parole eligibility date of March 18, 2027.

The parties do not dispute M.R. at some point was diagnosed with medulloblastoma, a malignant form of brain cancer. When he received that diagnosis is not clear from the documents provided in the appellate record, which does not appear to contain a complete set of M.R.'s medical records. A chart note states medulloblastoma typically begins in the cerebellum. According to a neurological-consultation record dated September 10, 2020, doctors recommended M.R. be sent to a hospital for a "more complete neurological evaluation" after a cervical spine magnetic resonance imaging (MRI) performed on M.R. showed an "indication . . . that there seems to be an abnormality in the cerebellum."

Some of M.R.'s medical records show he underwent surgery and other treatment for the medulloblastoma, but when that occurred is unclear. A February 4, 2021 chart note states M.R. has a "[past medical history] of

[diabetes mellitus], medulloblastoma [status post] tumor resection and C1 and partial C2 laminectomy on 1/14/21."  A September 1, 2022 chart note states M.R. has a history of "medulloblastoma [status post] midline craniotomy, C1 laminectomy and partial superior C2 laminectomy on 6/21/22."  A November 16, 2022 office-visit record lists under "Diagnosis" "medulloblastoma – mid[-]line craniectomy [status post] chemo and radiation treatment" and "craniectomy suboccipital resection cerebellar tumor."  Under an "Oncology Follow-up Visit" heading in that record, "[c]urrent treatment" is described as "none."  Under a "Chronic Care Assessment & Plan" heading, the following information is provided:  "[n]o evidence of any mass lesion in last MRI brain in 9/2022," "[n]o evidence of any metastasis in MRI spine in 9/2022," and "[h]as [follow up] MRI head order in for 3 month [follow up] in 12/2022."

On or about February 9, 2023, M.R. submitted to the DOC a request to determine his eligibility for compassionate release under the CRA.  A copy of the request was not included in the appellate record.  Pursuant to N.J.S.A. 30:4-123.51e(b), two licensed physicians, Drs. Jeffrey Pomerantz and Ruppert Hawes, issued reports in response to M.R.'s request.  Drs. Pomerantz and Hawes were affiliated with Rutgers University Correctional Health Care (UCHC), which is responsible for providing medical care to incarcerated

persons in DOC facilities.  See McCormick v. State, 446 N.J. Super. 603, 607-08 (App. Div. 2016).

In his February 9, 2023 report, Dr. Pomerantz identified medulloblastoma, type two diabetes, and hyperlipidemia as M.R.'s diagnoses. He found M.R. had a terminal condition with six months or less to live.  He concluded M.R. did not have a permanent physical incapacity, meaning he did not believe M.R. was unable to perform two activities of daily living such that he needed twenty-four-hour care.  Dr. Pomerantz acknowledged a "neurologist [had] document[ed] 'progressive neurological deficits with ataxic gait, speech dysarthria, and loss of dexterity on his hands predominantly on the right'" and that M.R. used a walker and wheelchair.  Regarding M.R.'s continuing care needs, Dr. Pomerantz opined he would need "oncologic [and] neurologic care as well as generalist control of [his diabetes and] hyperlipidemia."

Unlike Dr. Pomerantz, Dr. Hawes in his February 16, 2023 report concluded M.R. did not have a terminal condition.  He also found M.R. did not have a permanent physical incapacity.  He identified the same diagnoses: diabetes, hyperlipidemia, and medulloblastoma.  He described M.R.'s continuing care needs as ongoing oncology and neurology follow-up evaluations, "continued management of his diabetes and hyperlipidemia," and

physical and speech therapy "due to residual neurologic deficits (dysarthria, cranial 7 palsy, lack of coordination)."

In a February 22, 2023 memorandum, Dr. Herbert Kaldany, who identified himself as the "Director of Psychiatry, in lieu of DOC Medical Director," advised the DOC's commissioner that he had reviewed the reports provided by Drs. Pomerantz and Hawes and determined "[b]ased on those attestations reflecting the electronic medical record, there is no evidence that [M.R.] is suffering from a terminal condition, disease or syndrome, or permanent physical incapacity." Incorrectly reporting both doctors had found M.R. did not have a prognosis of six-months or less to live, Dr. Kaldany concluded M.R. was not eligible for compassionate release.

In a February 27, 2023 letter, Lisa Palmiere, who was the Director of Classification of the DOC's Division of Operations, advised M.R. "the medical diagnosis and prognosis prepared in [his] case . . . did not indicate that [he was] suffering from a terminal condition, disease, or syndrome, or a permanent physical incapacity." She also stated that "based on [his] medical evaluation, there [was] no indication that [he was] eligible for a compassionate release." She also advised him to contact medical staff or the administrator's office at his facility if his medical condition changed.

M.R. filed with this court a notice of appeal of that decision. The DOC moved for a remand so M.R.'s request for compassionate release could be reevaluated "in light of the fact that the two doctors who [had] evaluated M.R. . . . reached different conclusions about his eligibility." With M.R.'s consent, we granted that motion, retaining jurisdiction.

In an August 22, 2023 report, Dr. Pomerantz described M.R.'s diagnosis as: "[status post] midline craniectomy, C1 laminectomy and partial superior C2 laminectomy for medulloblastoma resection; [treatment] includes adjuvant chemo with craniospinal [radiation therapy] . . . no evidence of recurrence on MRI thus far; [patient] has moderate to severe dysarthria [and] voice impairment." Dr. Pomerantz found M.R. did not have a terminal condition or permanent physical incapacity, noting "no documented grave illness" and that M.R. did not require twenty-four-hour care. As for continuing care needs, Dr. Pomerantz concluded M.R. would "need regular neurosurgical [and] oncological [follow up] for medulloblastoma [and] routine medical care for [type two diabetes and] hyperlipidemia."

In his August 22, 2023 report, Dr. Hawes provided the following information under "[d]iagnosis":

> The patient is a 39-year-old man with a history of Diabetes Mellitus, Hyperlipidemia and Medulloblastoma. The patient is [status post] midline craniectomy, C1 laminectomy and partial superior C2

laminectomy for mass resection. He is undergoing adjuvant chemo with craniospinal [radiation therapy]. As of 7/17/23, there was no evidence of recurrence on MRI. Repeat MRI will continue imaging every 3 months until October 2023 at which point imaging will be done every 6 months. The patient has moderate-severe dysarthria and suspected voice impairment, as evidenced by imprecise articulation, decreased secretion management, irregular/slow rate of speech, and strained and breathy vocal quality. He also presents with moderate cognitive-linguistic impairment with deficits in the areas of memory, problem solving/ reasoning and orientation.

Dr. Hawes concluded M.R. did not have a terminal condition or a permanent physical incapacity and did not need twenty-four-hour care.[3] He identified the same continuing care needs he had listed in his prior report.

In an August 23, 2023 memorandum, Dr. Kaldany advised the DOC commissioner he had reviewed the new reports and found "no evidence that [M.R.] is suffering from a terminal condition . . . or permanent physical incapacity." He noted M.R. was "currently undergoing adjuvant chemotherapy with craniospinal radiation treatment," a July 17, 2023 MRI had shown no evidence of recurrence, and M.R. would "need repeated MRIs to monitor his condition." He concluded M.R. was not eligible for compassionate release.

---

[3] M.R. complains the physicians relied on dated medical records. The record does not support that assertion. Instead, the record shows they reviewed a recent MRI, among other records, in rendering their conclusions.

In an August 24, 2023 letter, Palmiere advised M.R. that according to the recent reports, he did not have a terminal prognosis or a permanent physical incapacity and "there [was] no indication that [he was] eligible for a compassionate release." She told him he could "reapply" if he could "provide evidence that [his] current medical condition has changed."

M.R. amended his notice of appeal to include the August 24, 2023 denial of his request.[4] He argues the DOC failed to comply with the CRA and related regulations by not physically examining M.R. and by failing to make requisite findings in determining his medical eligibility for compassionate release. Unpersuaded by those arguments, we affirm.

III.

We are mindful of the standard we apply in reviewing a final agency decision. "The scope of our review of an agency decision is limited." Mejia v. N.J. Dep't of Corr., 446 N.J. Super. 369, 376 (App. Div. 2016). We "recognize that state agencies possess expertise and knowledge in their particular fields." Caucino v. Bd. of Trs., Tchrs.' Pension & Annuity Fund,

---

[4] The DOC concedes the August 24, 2023 denial was its "final decision denying M.R.'s request for a certificate of compassionate release" and does not dispute our jurisdiction. See R. 2:2-3(a)(2); State v. F.E.D., 469 N.J. Super. 45, 59 n.9 (App. Div. 2021) (presuming an inmate could seek our review of a denial of a request for a certificate of eligibility for compassionate release under the CRA as a final agency decision), aff'd as modified, 251 N.J. 505 (2022).

475 N.J. Super. 405, 411 (App. Div. 2023) (quoting Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys., 431 N.J. Super. 1, 14 (App. Div. 2013)). "As a general matter, we will disturb an agency's adjudicatory decision only if we determine that the decision is 'arbitrary, capricious or unreasonable' or is unsupported 'by substantial credible evidence in the record as a whole.'" Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 302 (App. Div. 2022) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

"The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger." Parsells v. Bd. of Educ. of Borough of Somerville, 472 N.J. Super. 369, 376 (App. Div. 2022). In determining whether an agency action is arbitrary, capricious, or unreasonable, we consider "(1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion." Conley v. N.J. Dep't of Corr., 452 N.J. Super. 605, 613 (App. Div. 2018). We are not bound by an agency's statutory interpretation or other legal determinations. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Thus, we review de novo legal determinations about the meaning of the CRA. A.M., 252 N.J. at 442.

We are equally mindful of the guiding principles of statutory construction. The paramount goal of "statutory interpretation is to 'determine and give effect to the Legislature's intent.'" A.M., 252 N.J. at 450 (quoting State v. Lopez-Carrera, 245 N.J. 596, 612 (2021)). To achieve that goal, we "begin with the language of [the] statute, 'which is typically the best indicator of intent.'" Ibid. (quoting State v. McCray, 243 N.J. 196, 208 (2020)). We read the "[w]ords and phrases in a statute . . . not . . . in isolation" but "in context, along 'with related provisions[,] . . . to give sense to the legislation as a whole.'" Id. at 451 (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

When interpreting a statute, "[w]e must presume that every word in [the] statute has meaning and is not mere surplusage." Cast Art Indus., LLC v. KPMG LLP, 209 N.J. 208, 222 (2012) (quoting In re Att'y Gen.'s "Directive on Exit Polling:  Media & Non-Partisan Pub. Int. Grps.", 200 N.J. 283, 297-98 (2009)). We also "cannot presume the Legislature 'intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit.'" Simadiris v. Paterson Pub. Sch. Dist., 466 N.J. Super. 40, 49 (App. Div. 2021) (quoting Trumpson v. Farina, 218 N.J. 450, 467-68 (2014)). Nor can we "engage in conjecture or surmise which will circumvent the plain meaning of the act." DiProspero, 183 N.J. at 492 (quoting In re Closing of Jamesburg High Sch., 83 N.J. 540, 548 (1980)). Our

function is not "to 'rewrite a plainly-written enactment of the Legislature [] or presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (quoting O'Connell v. State, 171 N.J. 484, 488 (2002) (alteration in the original)). "Our duty is to construe and apply the statute as enacted." Ibid. (quoting In re Closing of Jamesburg High Sch., 83 N.J. at 548).

"If a statute's plain language is clear, we apply that plain meaning and end our inquiry." Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019). "If the language is ambiguous, courts can turn to extrinsic materials to determine the Legislature's intent," including "[l]egislative history, committee reports, and other sources[, which] can 'serve as valuable interpretive aid[s].'" A.M., 252 N.J. at 451 (quoting In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 19 (2020)).

Applying those principles, we reject M.R.'s interpretation of the CRA. M.R. asserts the plain language of N.J.S.A. 30:4-123.51e(b) "demonstrates that the physicians must physically examine the inmate." The problem with that contention is that the statute says absolutely nothing about a physical examination of the inmate. Instead, the statute requires the designated licensed physicians to make a "medical diagnosis" and then enumerates the requisite elements of that diagnosis, none of which is a physical examination. M.R.

relies on a non-medical dictionary definition of "diagnosis," which is not proof a "medical diagnosis" must include a physical examination or of a legislative intent to require a physical examination, especially when the Legislature did not include a physical examination in its list of requirements for the medical diagnosis to be rendered by the designated licensed physicians.

M.R. also relies on subparagraphs (i) and (j) of the CRA, but neither of those subparagraphs references or requires a physical examination. Subparagraph (i) addresses the procedures for the compassionate release of an inmate and authorizes the State Parole Board to "require an inmate to submit to periodic medical diagnoses by a licensed physician" "as a condition of compassionate release." N.J.S.A. 30:4-123.51e(i). Subparagraph (j) addresses the possible return of a released inmate to confinement:

> If, after review of a medical diagnosis required under the provisions of subsection i. of this section, the State Parole Board determines that a parolee granted compassionate release is no longer so debilitated or incapacitated by a terminal condition, disease or syndrome, or by a permanent physical incapacity as to be physically incapable of committing a crime or, in the case of a permanent physical incapacity, the parolee poses a threat to public safety, the State Parole Board shall so notify the prosecutor, who may initiate proceedings to return the inmate to confinement in an appropriate facility designated by the Commissioner of Corrections. . . .

In each of those subparagraphs, the Legislature expressly used the phrase "medical diagnosis," not "physical examination."

M.R. looks beyond the statute and relies on a regulation to support his position, N.J.A.C. 10A:16-8.6(a),[5] which provides:

> The two designated physicians will complete the required examinations and forward their attestations, and all related medical records, to the health services unit medical director for review. Following review of the medical records, the medical director shall make a medical determination of eligibility or ineligibility and issue a memo to the Commissioner of the Department of Corrections detailing the same.

Courts interpret regulations in the same way as they interpret statutes. In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016). Just as with a statute, a court "cannot insert qualifications into a . . . regulation that are not evident" from the regulatory language. U.S. Bank, N.A. v. Hough, 210 N.J. 187, 202 (2012). A regulation that is "at odds" with its related statute must be set aside. Piatt v. Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 101 (App. Div. 2015) (quoting Lourdes Med. Ctr. of Burlington Cnty. v. Bd. of Rev., 197 N.J. 339, 376 (2009)). Applying the same principles of statutory construction we apply to the CRA, the regulation cited by M.R. is not at odds with the statute. Like the CRA, the regulation says nothing about a "physical

_____

[5] M.R. also cites N.J.A.C. 10A:16-8.5, which contains some of the language of N.J.S.A. 30:4-123.51e(b).

examination." The regulation goes on to require the physicians to forward to the medical director "relevant medical records." N.J.A.C. 10A:16-8.6(a). A comprehensive reading of the actual language of the regulation leads us to conclude "examination" is a reference to a medical-record examination and not a requirement for a physical examination.

We perceive no ambiguity in the statutory language at issue. If we did perceive an ambiguity, a review of the legislative history also would lead us to conclude the Legislature did not intend in the CRA to require physical examinations of inmates seeking compassionate release. As our Supreme Court held in A.M., 252 N.J. at 439-40, the Legislature enacted the CRA to put into place "a streamlined process" with fewer, not more, hurdles in the path of inmates applying for compassionate release. Requiring inmates to undergo physical examinations before the designated physicians render their medical diagnoses would have the effect of delaying and complicating the process, not streamlining it.

By reviewing medical records to render a medical diagnosis, the designated physicians consider information "of a type reasonably relied upon by other experts in the particular field." James v. Ruiz, 440 N.J. Super. 45, 65 (App. Div. 2015) (quoting N.J.R.E. 703). And if a designated physician – the expert entrusted by the Legislature with this responsibility – believes the

17

medical records about an applying inmate do not provide sufficient information for the physician to render an accurate medical diagnosis, nothing in the CRA prevents the physician from requesting or performing a physical examination before giving the diagnosis.

We find no merit in M.R.'s argument "the DOC physicians failed to provide statutorily required information in their attestations." The designated physicians addressed each of the four subject matters the Legislature in N.J.S.A. 30:4-123.51e(b) required designated physicians to address and the reasons for their conclusions are clear. MRIs have shown no evidence of a recurrence of the medulloblastoma since M.R.'s surgery nor was there evidence of a permanent physical incapacity as defined by the statute.

The DOC's decision is supported by substantial credible evidence and is based on a correct legal interpretation of the CRA. M.R. has failed to demonstrate it was arbitrary, capricious or unreasonable. Accordingly, we affirm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2825-22