NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5028-14T1

JACLYN THOMPSON,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES, TEACHERS'
PENSION AND ANNUITY FUND,

    Respondent-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **April 11, 2017** |
| **APPELLATE DIVISION** |

Argued September 13, 2016 — Decided  April 11, 2017

Before Judges Ostrer, Leone, and Vernoia
(Judge Ostrer dissenting in part).

On appeal from the Board of Trustees of the
Teachers' Pension and Annuity Fund,
Department of Treasury.

Richard A. Friedman argued the cause for
appellant (Zazzali, Fagella, Nowak,
Kleinbaum & Friedman, attorneys; Mr.
Friedman, of counsel and on the briefs;
Edward M. Suarez, Jr., on the briefs).

Robert S. Garrison, Jr., Deputy Attorney
General, argued the cause for respondent
(Christopher S. Porrino, Attorney General,
attorney; Melissa H. Raksa, Assistant
Attorney General, of counsel; Mr. Garrison,
on the brief).

The opinion of the court was delivered by

LEONE, J.A.D.

Petitioner Jaclyn Thompson alleged that she was mentally disabled as a result of three incidents at work. She was awarded ordinary disability retirement benefits by respondent the Board of Trustees (Board) of the Teachers' Pension and Annuity Fund (TPAF). She appeals the Board's June 5, 2013 decision to deny accidental disability benefits.

Our Supreme Court has held that to obtain accidental disability benefits for a purely mental disability, "[t]he disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 34 (2008). The Court has applied that Patterson requirement to a person whose mental disability resulted from an incident where the person also suffered temporary physical injury. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 33 (2011).

Petitioner sustained no physical injuries in the three incidents, save for "a little bit of a stomachache" which was minor and temporary, and she required no medical treatment. However, Thompson argues she need not meet the Patterson requirement for mental disability because the incidents involved

physical contact. She cites an Appellate Division case which involved a potentially-fatal injury requiring debilitating treatment. Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys., 431 N.J. Super. 1 (App. Div. 2013). We hold that, under Russo, the Patterson requirement applies to claims for accidental disability benefits for mental disability arising from incidents involving mental and physical stressors if any physical injury was temporary or minor. To the extent Caminiti suggests otherwise, we must follow the Supreme Court's decision in Russo and apply the Patterson requirement.

Because the three incidents, individually and collectively, were not terrifying or horror-inducing events involving actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person, they do not meet the Patterson requirement. Therefore, we affirm.

I.

Petitioner testified as follows before the Administrative Law Judge (ALJ). Petitioner was a health and physical education teacher at North Hunterdon Regional High School. She taught regular gym classes, coached, and served as an advisor and mentor. She also taught adaptive gym classes specifically geared toward students with disabilities.

On January 21, 2011, during petitioner's health class, an approximately seventeen-year-old female student with Down syndrome began hitting a teacher's aide. When petitioner intervened, the student became extremely irate, punched petitioner in the stomach "very hard," and slapped her across her face. Petitioner and another aide immediately escorted the screaming student from the classroom. Petitioner was "a little nervous" during the incident but figured "it happens." She went to the nurse's office to write a report, and "kind of laid in the nurse's office for a few minutes only because [she] had a little bit of a stomachache." Petitioner did not seek any medical attention and sustained no lasting physical injuries. As class was over, she went home, but she returned to work the next day with no ill effects.

On September 22, 2011, petitioner was teaching an adaptive physical education class. During a Nerf pin soccer game, a sixteen-year-old male student with autism and borderline schizophrenia became severely angry, grabbed a pin, and approached a teacher's aide. Petitioner approached, and the extremely irate student "began to kind of push and shove" her shoulders with his hands and spat on the floor. Petitioner and an aide removed the student from the classroom. Petitioner was not physically injured and did not seek medical attention or

A-5028-14T1

counseling. She went to the nurse's office, reported the situation, and returned to work. She "was a little bit more like nervous going in the classroom" with "a little bit" of anxiety, and was "definitely on edge" about "what's next," but she had no psychiatric problems.

On October 29, 2011, during another Nerf pin soccer game, a fifteen-year-old male student with autism threw a ball at another student. When petitioner corrected him, he became very angry. He loudly told petitioner "You're an assh*le" and "I'm going to kick your ass," briefly "had [her] hands behind [her] back," then let go and threw three punches at her face, but she dodged the punches. Teacher's aides grabbed the student and escorted him out.

This third incident "did happen fast," but to petitioner it "fe[lt] like forever" that her hands were behind her back. She felt "helpless," "had no control," and "was petrified." Afterwards, she was very upset but calmed down and finished the class. She went to the nurse's office to report the incident. She had no physical injuries and went on with her day.

After going home and "sleeping on it," petitioner became "hysterical" and had "a downright almost panic attack." Her husband, a police officer, had her call a psychologist for police officers. The psychologist did not think petitioner

A-5028-14T1

"belonged in any kind of school atmosphere" and wrote a note putting her on leave. She never returned to work.

Eight months later, petitioner filed a request for accidental disability retirement benefits based on the three incidents. She stated that she was afraid of turning her back on students, and that she had panic attacks when attending her stepson's wrestling match and when seeing a special education class out in the community. Her psychiatrist diagnosed her with post-traumatic stress disorder (PTSD). The TPAF Board denied her request for accidental disability benefits but found petitioner qualified for a deferred retirement.

Petitioner appealed to the Office of Administrative Law. The ALJ heard testimony from petitioner, her psychiatrist, and a psychologist called by the Board. The ALJ found petitioner did not meet the standard for accidental disability benefits. However, the ALJ granted her ordinary disability benefits because, as a result of the incidents, "she became anxious, suffering from panic attacks, nightmares, vivid dreams, severe depression, lethargy, lack of motivation, and tachycardia." The ALJ found that she suffered from PTSD, that medication was ineffective at abating her symptoms, and that she was totally and permanently disabled from the performance of her regularly assigned duties.

Petitioner appealed the denial of accidental disability benefits.  The Board affirmed the ALJ.  Petitioner appeals.

## II.

We must hew to our standard of review.  Judicial "review of administrative agency action is limited.  'An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'"  Russo, supra, 206 N.J. at 27 (citations omitted).  "A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'"  In re Stallworth, 208 N.J. 182, 194 (2011) (citation omitted).

"Generally, courts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing."  Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007).  "Such deference has been specifically extended to state agencies that administer pension statutes," because "'a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise.'"  Piatt v. Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (citations omitted).  "An appellate court, however, is 'in no way bound by the agency's

interpretation of a statute or its determination of a strictly legal issue.'" Richardson, supra, 192 N.J. at 196 (citation omitted). Courts "apply de novo review to an agency's interpretation of a statute or case law." Russo, supra, 206 N.J. at 27.

## III.

"[A]n accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson, supra, 194 N.J. at 43. A TPAF member is eligible to be retired "on an accidental disability allowance" "if said member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." N.J.S.A. 18A:66-39(c).

It is undisputed that petitioner is permanently and totally disabled and that the three incidents occurred during and as a result of the performance of her regular, assigned duties. The parties dispute whether her disability was "a direct result of a traumatic event." Ibid.

## A.

"[T]he question of what constitutes a 'traumatic event' . . . has dogged courts for generations." Russo, supra, 206 N.J. at 28. Recently, our Supreme Court has redefined and

applied that phrase in three cases: Richardson, Patterson, and Russo.

In Richardson, supra, an inmate knocked a corrections officer to the ground, causing a complete tear of his wrist ligament which left him physically disabled. 192 N.J. at 192, 214. The Court ruled his physical disability was the direct result of a traumatic event. Id. at 214-15.[1] The Court held "the traumatic event standard will . . . be met by a work-connected event that is: (a) identifiable as to time and place; (b) undesigned and unexpected; and (c) caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work)." Id. at 192.

In Patterson, supra, the Court addressed "whether an applicant who has suffered a permanent mental disability as a result of a mental stressor, without any physical impact, can be considered to have experienced a 'traumatic event' and, if so, what standard should apply in assessing such a claim." 194 N.J. at 33. The Court held "a member must satisfy the standards in Richardson," and "add[ed] a requirement beyond those set forth

[1] The Court was considering an accidental disability statute, N.J.S.A. 43:16A-7(1), under the Police and Firemen's Retirement System (PFRS), but noted that the TPAF in N.J.S.A. 18A:66-39 "conditions the grant of accidental disability benefits on satisfying identical standards." Richardson, supra, 192 N.J. at 192 n.1.

in Richardson: [t]he disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Id. at 33-34, 50.

The Court in Patterson applied that requirement to three members who were permanently mentally disabled. First, Trooper Patterson was repeatedly insulted by an angry sergeant, and "was fearful that if he did not submit, the sergeant would hit him." Id. at 34-35. The Court ruled the conduct "simply did not involve actual or threatened death or serious injury to Patterson's physical integrity and thus failed to vault the traumatic event threshold." Id. at 51. Second, the Court found another trooper's exposure "to numerous incidents of racially motivated abuse carried out by fellow officers" was inadequate, but remanded to consider whether officers' death threats to the trooper "qualif[ied] as a traumatic event." Id. at 36-37, 51-52. Third, the Court found a "credible threat of rape and murder against [a correction officer]'s wife and daughter by a presumed gang member who knew where [he] lived and worked could satisfy the traumatic event element of the statute." Id. at 38-40, 53.

In Russo, supra, the Court "revisit[ed]" Richardson and Patterson. 206 N.J. at 17. Police Officer Russo "was involved in a terrifying fire rescue in which he was injured and the victim died." Id. at 18. Specifically, Russo tried to reach the victim who was crying out for help, but Russo became disoriented, dizzy, and nauseous. Id. at 19.

> Russo testified that the fire produced heavy smoke and incredibly intense heat: "The heat was all over. It felt like my ears were going to come right off my head, they felt like they were melting. It hurt to breathe, I could feel it everywhere. . . . [It] became increasingly harder to breathe, the heat and the smoke just kept getting worse. . . . [I] couldn't breathe."
>
> [Id. at 21-22.]

Russo was rescued by firefighters, received first aid, and was hospitalized overnight for smoke inhalation. Id. at 19-20.

While still at the fire scene, Officer Russo saw the victim's body brought out, and the victim's family "confronted Russo, blaming him and the other officers for the victim's death." Id. at 20. Russo was unable to return to work for weeks, was diagnosed with PTSD, and was "permanently mentally disabled." Id. at 20, 34-35. The PFRS Board found Russo "satisfied Richardson and experienced a Patterson-type horrific event." However, the PFRS Board ruled the event was "'not objectively capable of causing a reasonable person in similar

circumstances to suffer a disabling mental injury.'"  Id. at 18 (citation omitted).

Even though Officer Russo was physically injured, the Court applied the Patterson requirement.  Id. at 33.  The Court found Russo met "the objective reasonableness standard of Patterson." Ibid.  Thus, the Court reversed.  Id. at 35.

## B.

Petitioner argues she need only meet the Richardson standard for disability, not the Patterson requirement for mental disability.  We agree with the ALJ and the TPAF Board that under Russo, petitioner must meet both the Richardson and Patterson standards.

Unlike Richardson, where the officer suffered a disabling physical injury, petitioner did not suffer a physical disability.  Indeed, the ALJ found "petitioner was not physically injured" in any of these incidents.  In the first incident, the adolescent girl's punch and slap resulted in just "a little bit of a stomachache."  Even if it was a physical injury, it was minor and lasted only a few minutes.  In the second incident, the adolescent boy "kind of" pushed and shoved her shoulders with his hands.  In the third incident, another adolescent boy held petitioner's hands behind her back for a few seconds.  She concededly was not physically injured in the

second or third incident and did not seek or need medical treatment in any of the incidents.

Such minor physical contacts with little or no physical injury, only the punch's minor and temporary effects, would not themselves meet the Richardson standard for a disabling injury. Under Richardson, "an applicant for accidental disability benefits must meet 'an extraordinarily high threshold that culls out all minor injuries; all major injuries that have fully resolved; all partial or temporary disabilities; and all cases in which a member can continue to work in some other capacity.'" Patterson, supra, 194 N.J. at 43 (quoting Richardson, supra, 192 N.J. at 195).

Here, as the ALJ found, petitioner's "application is solely based on mental diagnoses." Thus, she must rely on her "permanent mental disability as a result of a mental stressor," rather than the minor, temporary physical effects. Id. at 33. Therefore, she was required to meet the Patterson requirement.

Petitioner contends she need not meet the Patterson requirement because there was physical contact. She cites language in Patterson favoring her position. In Patterson, the Court stated it "ha[s] been asked to determine whether an applicant who has suffered a permanent mental disability as a result of a mental stressor, without any physical impact, can be

considered to have experienced a 'traumatic event.'" Ibid. "The only issue is whether [a permanent mental] injury will be recognized as a basis for accidental disability if it is caused by an exclusively psychological trauma." Id. at 44-45; see id. at 43. The Court held "permanent mental injury caused by a mental stressor without any physical impact can satisfy the Richardson standard." Id. at 48. The Court first ruled "a member suffering from a so-called mental-mental injury must satisfy the standards we recently enunciated in Richardson." Id. at 33-34.[2] The Court added "to obtain accidental disability benefits for a mental injury precipitated by an exclusively mental stressor, a member must satisfy" the Patterson requirement. Id. at 34, 50.

However, in Patterson it was not clear the Court was restricting its new requirement to such situations, rather than simply referring to the issue before it — three members whose mental disabilities were caused exclusively by mental stressors. Moreover, the Court applied the requirement to mental disability

_____

[2] The Court noted "[t]he accidental disability statutes themselves do not expressly include the mental-mental category," but that workers' compensation cases recognized "the so-called mental-mental category of compensable injury." Patterson, supra, 194 N.J. at 45-47 (quoting Brunell v. Wildwood Crest Police Dep't, 176 N.J. 225, 243 (2003) (defining mental-mental as "cases in which a purely mental stimulus results in emotional or nervous injury")).

"without any physical impact," a term encompassing situations where there was no physical injury or only minor or temporary physical injury. Id. at 33, 48.

In any event, the Court's decision in Russo made clear the Patterson requirement applies to members whose mental disability resulted from mental stressors accompanied by temporary physical injury. As set forth above, the Court found Officer Russo was physically injured by the fire's heat and smoke, which caused him pain and breathing difficulties. Russo, supra, 206 N.J. at 18-22. The Court emphasized "Russo experienced a qualifying event insofar as he was ordered into a burning building so full of intense heat and smoke that his uniform was singed," and, "in fact, he was hospitalized for smoke inhalation" overnight. Id. at 33-34. The Court viewed Russo's mental disability as deriving in part from physical stressors and physical injury.[3]

Nonetheless, the Supreme Court required the physically-injured Russo to meet the Patterson requirement. Id. at 18, 33-35. The Court ruled "the objective reasonableness standard of

---

[3] The Court rejected the suggestion that Russo's mental disability "did not directly result from the horrific fire incident, but from 'guilt feelings' over the victim's death." Russo, supra, 206 N.J. at 34. Rather, the Court found "[i]t was as a result of the fire and the confluence of events it generated, including the death of the victim and the relatives' accusations, that Russo was rendered permanently mentally disabled." Id. at 34-35.

Patterson has been met" both because of the threat of death and serious bodily injury to Russo himself and because "Russo clearly satisfied the other Patterson standard . . . [as] he experienced a terrifying event that presented 'a serious threat to the physical integrity of another person,'" namely the fire's threat to the victim. Id. at 33-34. Thus, the Court found that "Russo sustained his burden," that the incident "objectively satisfied Patterson," and that Russo's "circumstances plainly satisfied both Patterson and Richardson." Id. at 34-35.

Indeed, the Court in Russo would have had no need to engage in the above analysis if it believed the Patterson requirement only applied to members whose mental disability resulted solely from mental stressors unaccompanied by physical injury. The Court could have simply stated Patterson did not apply to Russo because of his temporary physical injuries. Instead, the Court explained at length both the nature of the Patterson requirement and how Russo carried his burden under the Patterson requirement. Id. at 18-19, 31-35.

Moreover, the Court in Russo reiterated and emphasized the necessity of applying the Patterson requirement to members like Russo (and petitioner) who claim mental disability. The Court stated: "We adopted that standard to assure the bona fides of claimed mental injuries and to ameliorate the problem of

subjectivity inherent in mental claims." Id. at 31 (citing

Patterson, supra, 194 N.J. at 50).

> "In most physical disability claims, medical
> analysis quickly goes beyond the subjective
> statement by the patient to clinical and
> laboratory tests by the physician . . . .
> In psychiatric disability claims, by
> contrast, medical analysis to a greater
> degree is analysis of the subjective
> statement of the patient." Thus, in the
> context of psychological injuries, the
> proofs related to the traumatic nature of an
> event and the causal relationship between
> event and injury may be more problematic
> than in the case of a physical event. As a
> result the boards have expressed legitimate
> concerns about becoming bogged down in
> litigation over idiosyncratic responses by
> members to inconsequential mental stressors.
>
> [Ibid. (quoting Patterson, supra, 194 N.J.
> at 48-49 (citation omitted)).]

"In response, [the Court] established a high threshold for

the award of accidental disability benefits" in Patterson.

Ibid. "Satisfying Patterson eliminates the problem of

'idiosyncratic responses by members to inconsequential mental

stressors.'" Id. at 32 (quoting Patterson, supra, 194 N.J. at

49).

Thus, the Supreme Court assigned an important role to the

Patterson requirement — to prevent idiosyncratic and subjective

claims of mental disability from crossing the high threshold for

the award of accidental disability benefits. The important and

necessary purpose of the Patterson requirement is served by its

application as in Russo to claims based on mental disability due to mental stressors even if accompanied by minor or temporary physical injuries.

Here, for example, there were no clinical or laboratory tests of petitioner's minor and temporary physical complaint. Rather, her subjective statements provided the sole basis for the description of her mental disability and the factual basis for her psychiatrist's testimony. Id. at 31. That made the traumatic nature of the incidents and the causal relationship between the incidents and her claimed injury more problematic. Ibid. Applying the Patterson requirement to petitioner and similar claimants for mental disability properly weeds out "idiosyncratic responses" and "limit[s] accidental disability recovery to stressors sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances." Patterson, supra, 194 N.J. at 49-50; accord Russo, supra, 206 N.J. at 32.

As the Court recognized in Patterson, supra, "a traumatic event giving rise to a mental disability, like PTSD, may . . . involve physical impact." 194 N.J. at 45. In Russo, supra, the Court decided such claims of mental disability had to satisfy the Patterson requirement. To rule otherwise would allow such mental disability claims to escape the objective test the Court

required to avoid "the problem of subjectivity" and "idiosyncratic responses." 206 <u>N.J.</u> at 31-32 (quoting <u>Patterson</u>, <u>supra</u>, 194 <u>N.J.</u> at 49, 50).

Accordingly, under our Supreme Court's decision in <u>Russo</u>, petitioner must satisfy the <u>Patterson</u> requirement. However, she argues she is not required to do so under the Appellate Division decision in <u>Caminiti</u>. However, <u>Caminiti</u>, <u>supra</u>, failed to recognize the effect of <u>Russo</u>'s application of the <u>Patterson</u> requirement to a member suffering both temporary physical injury and disabling mental injury. 431 <u>N.J. Super.</u> at 4. Instead, <u>Caminiti</u> stated "[t]he <u>Patterson</u> standard is inapplicable where a petitioner suffers both a physical and psychiatric injury," and "[t]he Board's analysis should have ended with an application of the <u>Richardson</u> factors." <u>Id.</u> at 14, 21.

Those statements in <u>Caminiti</u> contravene our Supreme Court's decision in <u>Russo</u>, <u>supra</u>, that the <u>Patterson</u> requirement was applicable to Russo, who suffered both a physical and psychiatric injury. 206 <u>N.J.</u> at 34.

In any event, petitioner's case is clearly distinguishable from <u>Caminiti</u>, where the member's physical injury created a risk of death and required traumatic treatment. Officer Caminiti was subduing a violent intravenous drug user when a needle in the user's shirt pierced the officer's finger "from the bottom

through to the nail." Caminiti, supra, 431 N.J. Super. at 7. The user, who had track marks all over his arms, said: "I'm sorry. I just used it." Id. at 8. Caminiti was immediately afraid he was fatally infected with the AIDS virus. Ibid.

Other officers tried to squeeze the blood out of Caminiti's finger and ordered him to go to the hospital. Ibid. There, doctors forbade him from having any sexual relations with his wife or letting his saliva contact his children for six months. Ibid. The doctors were unable to determine if Caminiti was infected, and prescribed "'the AIDS cocktail,'" telling him it "'could possibly prevent [him] from contracting AIDS,'" but "would make him 'deathly ill.'" Id. at 8, 9. While taking the AIDS cocktail,

> [h]e was constantly vomiting and became dehydrated. Eventually he obtained a prescription for a drug given to cancer patients to counteract the effects of chemotherapy and lessen the nausea. The medication also made him "jittery" and unable to concentrate. The doctor's warning concerning the physical effects of the medications did not prepare him for the emotional and psychological trauma he experienced.
>
> [Id. at 9.]

Caminiti became "mentally incapacitated." Id. at 22.

In ordering accidental disability benefits for Caminiti, we stressed that, "[i]n addition to the physical impact of the

potentially lethal needle prick, appellant endured many weeks of physical discomfort associated with the medications prescribed to prevent the transmission of HIV."  Id. at 21.  "The treatment created specific, medically anticipated, and extremely harsh effects on his body that were similar to the effects experienced by cancer patients who undergo chemotherapy after surgery." Ibid.

We emphasized "[t]his was not an officer who accidentally stuck himself on a straight pin while frisking a suspect's clothes and was treated with a band-aid or experienced a minor infection at the site."  Ibid.

> To the contrary, the medical effect of the event was comparable to the experience of surgical intervention or extended hospitalization.  It triggered serious bouts of pharmacological intervention and a prolonged period of physical discomfort and recovery.  Simply stated, the record does not support the Board's finding that appellant's physical injury was "minor."
>
> [Ibid.]

Unlike Caminiti, petitioner suffered little or no physical injury and required no medical treatment, hospitalization, or medication.  The physical effect of the "little bit of a stomachache" was temporary and minor and no greater than a pin wound requiring a band-aid and resulting in minor infection, which Caminiti was careful to distinguish.  Her physical effect

could not compare with Caminiti's potentially fatal injury and hellish treatment. Even if Caminiti's physical injury and treatment was sufficient to justify not applying the Patterson requirement, petitioner experienced neither physical injury nor treatment, and had to meet the Patterson requirement.

Accordingly, petitioner had to show her mental disability "result[ed] from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Russo, supra, 206 N.J. at 18 (quoting Patterson, supra, 194 N.J. at 34).

C.

We agree with the ALJ and the TPAF Board that petitioner failed to meet the Patterson requirement. Petitioner's three separate incidents involved an adolescent girl punching her and slapping her face; an adolescent boy "kind of" pushing and shoving her shoulders with his hands and spitting on the floor; and an adolescent boy placing her hands behind her back for a few seconds, then swinging and missing. In the first incident, petitioner experienced only "a little bit of a stomachache," which the ALJ found was not a physical injury and which in any event was minor and temporary. Petitioner admittedly was not physically injured in the second or third incidents. She

neither needed nor sought medical treatment after any of the incidents. In each incident, petitioner was accompanied by teacher's aides who quickly assisted petitioner in removing the student. Considering the totality of the circumstances, we agree with the ALJ and the Board that these three incidents, whether considered individually or collectively, failed to meet the Patterson requirement.

Petitioner contends the incidents were terrifying and horror-inducing for her. However, her subjective views do not satisfy "the objective reasonableness standard of Patterson." Id. at 33. None of the incidents here were "a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson, supra, 194 N.J. at 50 (emphasis added). The Court "impose[d] the aforementioned limitations to assure objectivity in the analysis." Ibid.

Regarding the third incident, petitioner's psychiatrist opined that, while her arms were behind her back, it was a "potentially life threatening situation" because she "could have been seriously injured" or "killed in that position." However, her arms were no longer behind her back when the swings occurred, and she was able to dodge them. Moreover, the

psychiatrist conceded he did not even know the adolescent's age, let alone strength. Thus, "the facts of record" do not show that this third incident was life threatening, unlike the burning building in Russo. Cf. Russo, supra, 206 N.J. at 33.[4] Moreover, the ALJ and the Board did not find that the third incident involved threatened death or serious injury.

Petitioner notes she was diagnosed with PTSD. However, the diagnostic criteria for PTSD are not identical to the Patterson requirement. In particular, our Supreme Court requires the member show the incident involved "actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson, supra, 194 N.J. at 50 (emphasis added); cf. id. at 49 (setting forth the DSM-IV-TR diagnostic criteria, which omit the emphasized words). Here, the incidents did not involve threatened death or serious injury or a similarly serious threat to petitioner's physical integrity.

More importantly, the Supreme Court in Patterson and Russo did not hold that any employee who obtains a PTSD diagnosis qualifies for accidental disability benefits. In Patterson, the

---

[4] The dissent adds "that had one or more of the three swings [by the fifteen-year-old] landed on petitioner's head, petitioner could have suffered traumatic brain injury, fractures, or sensory damage." Post at __ (slip op. at 7). However, there was no such evidence before the ALJ.

Court did not equate a diagnosis of PTSD with the Patterson requirement; rather, it simply used the history and criteria of PTSD as a "backdrop" showing there could be "a causal relationship between certain delineated traumatic events and a resultant mental disorder." Id. at 40-42, 49. In Russo, supra, Russo was diagnosed with PTSD. 206 N.J. at 20-21. Rather than treating that diagnosis as decisive, the Court did not even mention Russo's PTSD diagnosis in its analysis of why he met the Patterson requirement. Id. at 33-35.

In any event, it is the Board, not a member's psychiatrist, which determines whether the incident meets "Patterson's objective reasonableness standard." Id. at 33. The ALJ and the TPAF Board did not adopt the conclusion of petitioner's psychiatrist that "any of the assaults that [she] suffered would cause a reasonable person in her circumstances [to] suffer a disabling injury." Further, the psychiatrist's hypothesizing about what a reasonable person would do cannot change whether or not "a member has experienced a qualifying incident — a 'terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person.'" See id. at 25-27, 31-33 (quoting Patterson, supra, 194 N.J. at 50).

The failure of petitioner's incidents to meet that standard is illustrated by the Supreme Court's dispositions of the three appeals in Patterson. Petitioner feared being hit by an angry adolescent, but the Court held Patterson's fear of being hit by an angry police sergeant "simply did not involve actual or threatened death or serious injury to Patterson's physical integrity and thus failed to vault the traumatic event threshold." Patterson, supra, 194 N.J. at 51. The adolescent threatened to "kick [her] ass," but that pales by comparison to the death threats and the gang member's threats to rape and murder considered in Patterson. Id. at 52-53.

Petitioner's incidents also bore no resemblance to the traumatic events the Supreme Court in Russo found satisfied the Patterson requirement. The Court stressed that Russo, "was ordered into a burning building," where "[t]he intensity of the fire terrified and disoriented Russo, singed his uniform, and sent him to the hospital overnight for smoke inhalation," which the Court viewed as a life-threatening situation. Russo, supra, 206 N.J. at 33-34. Moreover, the fire also presented "'a serious threat to the physical integrity of another person' — the victim, who suffered while crying out for help that Russo was unable to provide and who ultimately died as a result of the

fire," after which "the victim's family heaped scorn on Russo and blamed him for their relative's death." Id. at 34.

Nor did petitioner's incidents resemble the traumatic experiences involved in the only other published case applying the Patterson requirement. See Hayes v. Bd. of Trs. of Police & Firemen's Ret. Sys., 421 N.J. Super. 43 (App. Div. 2011). In 1998, after Officer Hayes and other officers tried to stop a stolen car, it "'ran over' one of the responding officers," and police "responded with gunfire, severely injuring the unarmed teenage driver and killing his fifteen-year-old female passenger" in a highly-publicized, controversial shooting. Id. at 47. In a 2001 incident, while shots were being fired, Hayes rescued a wounded officer whom she discovered "was her younger brother, who had been shot in the face and neck. [Hayes] cradled her brother in her arms, certain he was going to die, as he lay on the ground bleeding profusely." Ibid. Subsequently, Hayes "learned [that] a 'hit' had been put out on her by a Trenton gang," and that "the driver of the vehicle involved in the 1998 shooting had been released from prison" and might come for her. Id. at 48.

Further, petitioner's incidents do not rise to the level of the examples given in Patterson, supra: "Under that standard a permanently mentally disabled policeman who sees his partner

27

shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant all could vault the traumatic event threshold." 194 N.J. at 50. Petitioner was not held hostage by a student. Rather, in a classroom containing several teacher's aides, a student had petitioner's hands behind her back for a few seconds until he let go and was removed from the room by the teacher's aides. As the ALJ found, the incidents, "although undoubtedly distressing, did not constitute a terrifying or horror-inducing event in line with the examples given by the Patterson Court."

We do not question the mentally-disabling reaction petitioner had to these incidents. However, Patterson imposed an "objective standard[]" based on the "the character of an event rather than" the reaction of an individual claimant. Ibid. By adding the Patterson requirement, our Supreme Court "achieve[d] the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Russo, supra, 206 N.J. at 18 (quoting Patterson, supra, 194 N.J. at 34). "Satisfying Patterson eliminates the problem of 'idiosyncratic responses by members to

inconsequential mental stressors[.]'" <u>Id.</u> at 32 (quoting <u>Patterson</u>, <u>supra</u>, 194 <u>N.J.</u> at 49).

Here, the ALJ found petitioner's mental disability in response to these incidents was "the very definition of an idiosyncratic response." The Board affirmed. We cannot say that finding was arbitrary, capricious, or unreasonable. While petitioner's idiosyncratic response entitled her to ordinary disability benefits, it failed to satisfy the <u>Patterson</u> requirement for accidental disability benefits.

Before we conclude discussion of the <u>Patterson</u> standard, we address three arguments not raised by petitioner but raised by the dissent. First, the dissent asserts the ALJ replicated the error in <u>Russo</u>. We disagree.

In <u>Russo</u>, the PFRS Board found Russo's "'disability did result from direct personal experience of a terrifying or horror-inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of [Russo] or another person.'" <u>Id.</u> at 24; <u>see</u> <u>id.</u> at 25. Despite finding that Russo "experienced a <u>Patterson</u>-type horrific event," the Board then found "the event was 'inconsequential' and 'not objectively capable of causing a reasonable person in similar circumstances to suffer a disabling

mental injury.'"  Id. at 18; see id. at 24-25.  Our Supreme

Court ruled:

> [T]he [PFRS] Board went astray in [Russo's]
> case in failing to recognize that once a
> member has experienced a qualifying incident
> — a 'terrifying or horror-inducing event
> that involves actual or threatened death or
> serious injury, or a similarly serious
> threat to the physical integrity of the
> member or another person' — the objective
> reasonableness standard of Patterson has
> been met.
>
> [Id. at 33 (quoting Patterson, supra, 194
> N.J. at 50).]

By contrast, the ALJ did not find a qualifying event and

then fail to recognize the dispositive nature of that finding.

Rather, the ALJ found no qualifying event had occurred.  The ALJ

began by recognizing that "'[t]he disability must result from

direct personal experience of a terrifying or horror-inducing

event that involves actual or threatened death or serious

injury, or a similarly serious threat to the physical integrity

of the member or another person.'" (quoting Patterson, supra,

194 N.J. at 34).  The ALJ cited the examples of qualifying

events cited in Patterson, supra, 194 N.J. at 48-50,[5] and ruled:

---

[5] The dissent criticizes the ALJ for referencing what the Supreme
Court in Patterson called the "relevant statutory incidents
under N.J.S.A. 40A:14-196."  Patterson, supra, 194 N.J. at 49.
However, the ALJ simply noted: "Although these examples are law-
enforcement specific, the Patterson Court used them to suggest
the quality of traumatic event that might be expected to result
(continued)

"I CONCLUDE that [petitioner] does not meet the additional requirements . . . enunciated in Patterson" because "[t]he circumstances of the three incidents experienced by the petitioner, although undoubtedly distressing, did not constitute a terrifying or horror-inducing event in line with the examples given by the Patterson Court."

Only then did the ALJ add: "In other words, the stressors were not sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances." That echoed the Supreme Court's own language: "Put another way, by our enunciation [of the Patterson requirement], we limit accidental disability recovery to stressors sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances." Id. at 50.

The ALJ reiterated: "I cannot conclude that petitioner here experienced a terrifying or horror-inducing event or events that would have caused a reasonable person in similar circumstances to suffer a disabling mental injury." That resembled the Court's statement in Patterson: "a qualifying horrific event

_____

(continued)
in mental injury under the various public-sector pension plans." The ALJ's comment reflected the Supreme Court's assessment of N.J.S.A. 40A:14-196: "To be sure, [its] categories are law-enforcement specific," but it "sheds light on the meaning of the term 'traumatic event' in the accidental disability statutes." Id. at 45, 49.

A-5028-14T1

must be objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Id. at 34.

The ALJ briefly posited that "[a] reasonable teacher might have found the incident upsetting or disturbing [at] being pushed and shoved, or grabbed." The ALJ then continued examining the nature of the incidents: "The petitioner was not physically injured and there were no weapons brandished at or near her or even involved in these incidents. The physical trauma that petitioner described was minimal[.]" The ALJ properly distinguished petitioner's case from the "hostage" example given by the Supreme Court. See Russo, supra, 206 N.J. at 31 (quoting Patterson, supra, 194 N.J. at 50).[6] The ALJ's brief discussion of the reasonable teacher, while unnecessary, was not "clearly capable of producing an unjust result" given her proper application of the correct standard. R. 2:10-2.

Second, the dissent asserts petitioner met the Patterson requirement due to her lack of training in dealing with physically disruptive students, and cites Russo. We note that the Supreme Court mentioned the PFRS "Board should have

---

[6] The dissent asserts the ALJ minimized the third incident by saying the adolescent "grabbed" petitioner's arms. However, the ALJ also stated the adolescent "yanked them behind her back." Moreover, petitioner testified only that the adolescent "had my hands behind my back."

recognized that Russo experienced a qualifying event" in part because "he had no training or equipment for such an event." Id. at 33. However, the Supreme Court in Russo primarily addressed the role of training under "Richardson's 'undesigned and unexpected' standard," finding that Russo met that Richardson standard due to his lack of firefighting training. Id. at 33-35.[7]

Even assuming an employee's training can be considered in determining if an incident meets "the objective reasonableness standard of Patterson," petitioner's lack of training does not convert any of the three incidents into a "terrifying or horror-inducing event that involve[d] actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Id. at 33 (quoting Patterson, supra, 194 N.J. at 50).

Third, the dissent asserts the Board's determination is far afield from the historical requirements established several decades ago by the Legislature for accidental disability benefits. However, it was not until 2008 that the Supreme Court in Patterson, supra, held that "an applicant who has suffered a

---

[7] As set forth below, we find petitioner's lack of training helped her meet that Richardson standard. We need not address our dissenting colleague's additional comments regarding that standard.

permanent mental disability as a result of a mental stressor, without any physical impact," could qualify for an accidental disability retirement. 194 N.J. at 33. The Court recognized it was necessary to add "a new test" in order "to assure the bona fides of claimed mental injuries[,] to ameliorate the problem of subjectivity inherent in mental claims," and to "eliminate[] the problem of 'idiosyncratic responses.'" Russo, supra, 206 N.J. at 31-32 (quoting Patterson, supra, 194 N.J. at 49). The Court thus "established a high threshold for the award of accidental disability benefits" based on claims of mental disability. Id. at 31.

Finally, it is crucial to remember that we are neither the factfinder nor the administrative agency charged with making the determination whether the threshold has been met. Absent a misinterpretation of the statute or case law, an appellate court's "review of administrative agency action is limited," and the Board's "'decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Id. at 27 (citation omitted). Petitioner failed to make the requisite clear showing.

IV.

As the Supreme Court stated in Russo, "Patterson is the threshold that must be met for further inquiry to be warranted." Id. at 32. Nonetheless, we also consider petitioner's claim that these incidents were not "undesigned and unexpected" under Richardson, supra, 192 N.J. at 212. The ALJ and the Board found the incidents were not undesigned or unexpected because a high school health and physical education teacher should expect to experience such incidents.

However, in Richardson, our Supreme Court rejected the similar argument "that because subduing an inmate is part of the anticipated work of a corrections officer and was not unexpected or unintended, Richardson cannot satisfy the traumatic event standard." Id. at 213. "That is a misreading of the statute, which requires that the traumatic event occur 'during and as a result of the performance of [the member's] regular or assigned duties.'" Ibid. The Court noted that under prior statutes the courts long "defined 'accident' in accordance with its ordinary meaning — as 'an unlooked for mishap or untoward event which is not expected or designed.'" Id. at 197 (citations omitted). The Court ruled that under the current statutes "a traumatic event is essentially the same as what we historically understood an accident to be — an unexpected external happening that

directly causes injury and is not the result of pre-existing disease alone or in combination with work effort."  Id. at 212; see id. at 214.

Richardson gave examples of physically traumatic events, occurring during ordinary work effort, which were "undesigned and unexpected": "A policeman can be shot while pursuing a suspect; a librarian can be hit by a falling bookshelf while re-shelving books; a social worker can catch her hand in the car door while transporting a child to court."  Id. at 214. Similarly, a "gym teacher who trips over a riser and is injured has satisfied the standard."  Id. at 213.

The Board cites the job description, which states a health and physical education teacher "[e]stablishes and maintains standards of pupil behavior needed to provide an orderly, productive learning environment."  However, there was no evidence it was a designed and expected part of petitioner's job that she be punched, slapped, pushed, shoved, restrained, or threatened with physical harm by students.  Thus, the incidents were undesigned and unexpected under the Richardson test.[8]

---

[8] Richardson, supra, rejected a prior test requiring the member to show "his injuries were not induced by the stress or strain of the normal work effort."  192 N.J. at 192.  Even under that test, we observed:

(continued)

The ALJ concluded the assaults were not undesigned and unexpected on the premise that "[i]t is not unusual for [special education] students to become distressed and upset in class or to act out with others. The petitioner should have anticipated that such conduct could or would occur in a physical education class of adolescents." However, no evidence was introduced to support that premise. In any event, "an accident can be 'undesigned and unexpected' under the Richardson tests even though it may be concluded in retrospect that the employee could have anticipated the risk of such an accident and taken steps to

_____

(continued)

      having to break up fistfights among students in a school corridor and then suffering the physical or emotional sequelae thereof are [not] part of the "stress or strain of the normal work effort" of a teacher. It may be part of the stress or strain of the normal work effort of a policeman or a security guard, but we do not regard the hazards of combat as part of the normal stress of public school educators.

      [Pushko v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 208 N.J. Super. 141, 145 (App. Div. 1986).]

Moreover, under that test our Supreme Court found that while corrections officers must subdue inmates, "it is not part of the stress or strain of the 'normal' work effort of a corrections officer to be violently assaulted by an inmate. Corrections officers are not hired to be punching bags." Gable v. Bd. of Trs. of Pub. Emps. Ret. Sys., 115 N.J. 212, 224 (1989). Though these cases under the prior test are not dispositive, they are instructive.

avoid it." Brooks v. Bd. of Trs., Pub. Emp. Ret. Sys., 425 N.J. Super. 277, 284 (App. Div. 2012) (finding undesigned and unexpected a school custodian's injury when the students helping him carry a 300-pound weight bench dropped their side of the weight bench).

The Supreme Court added in Russo that a member's training must be considered:

> [A]n employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the "undesigned and unexpected" test. Thus, for example, an emergency medical technician who comes upon a terrible accident involving life-threatening injuries or death, will have experienced a Patterson-type horrific event, but will not satisfy Richardson's "undesigned and unexpected" standard because that is exactly what his training has prepared him for.
>
> [Russo, supra, 206 N.J. at 33.]

In Russo, Russo's role in the house fire was "undesigned and unexpected" because he "was trained and equipped as a police officer, not as a firefighter." Id. at 24, 34. We have since held, because an engine company firefighter was trained to deploy hoses, and his "training had not prepared him to break into burning buildings without the battering rams and other specialized equipment used by the truck company," an incident where he had to kick in a door to rescue victims trapped inside

a burning building was undesigned and unexpected. <u>Moran v. Bd.</u> <u>of Trs., Police & Firemen's Ret. Sys.</u>, 438 <u>N.J. Super.</u> 346, 355 (App. Div. 2014).

Being assaulted was not part of petitioner's job description or training. She had a certification allowing her to teach adaptive special physical education, but there was no evidence she received training about handling violence from special needs students. After the first incident, she requested training on how to restrain students, but her request was denied.

Therefore, the Board erred in concluding the incidents were not undesigned and unexpected. However, because petitioner failed to meet the <u>Patterson</u> requirement, the Board properly rejected her claim for accidental disability benefits.[9]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] Thus, we need not resolve whether petitioner was disabled as "a direct result of" the incidents, as required by <u>Richardson</u>, <u>supra</u>, 192 <u>N.J.</u> at 212.

_____

**OSTRER, J.A.D., dissenting.**

I concur with, and join in, my colleagues' determination that the Patterson objective reasonableness test applies to this case, in which petitioner suffered both mental injury and minor physical injury. I part company with my colleagues because I believe petitioner met that test, and the Board erred in reaching the opposite conclusion. Thus, I dissent from Part III-C of the majority opinion.

Since the Board adopted the ALJ's decision, I look to the ALJ's reasoning to explain the Board's result here. That reasoning included multiple reversible errors.

1.

Contrary to Russo, the ALJ required petitioner to satisfy more than the Patterson standard by evaluating whether petitioner's response to the assault against her was reasonable for similarly situated teachers. Then, applying the wrong standard, the ALJ found that petitioner failed in that showing without adequate support in the record.

The purpose of the Patterson objective test was to allay concerns regarding the subjectivity of psychological "proofs related to the traumatic nature of an event and the causal relationship between event and [mental] injury." Patterson,

*supra*, 194 N.J. at 48. The Court achieved this by focusing its legal standard on the underlying event. The Patterson test is satisfied upon a showing that the petitioner experienced a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Id. at 50. The Court in Patterson noted that by applying its definition of a qualifying incident, the Court "assure[d] that the traumatic event is objectively capable of causing a permanent, disabling mental injury to a reasonable person under similar circumstances." Ibid.

Accordingly, the "terrifying and horror-inducing event" standard already incorporates the concern that the injury is caused by an event that is "objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Id. at 34. As the Court in Russo highlighted, "once a member has experienced a qualifying incident — a 'terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person' — the objective reasonableness standard of Patterson has been met . . . ." See Russo, supra, 206 N.J. at 33 (quoting Patterson, supra, 194 N.J. at 50) (noting that the Board "went

astray" in failing to recognize this concept). At that point, a petitioner need only satisfy the <u>Richardson</u> factors to merit an accidental disability pension. <u>Ibid.</u> The Board must not try to determine separately, untethered from the <u>Patterson</u> definition of a qualifying incident, whether an event was "inconsequential" or "objectively capable of causing a reasonable person in similar circumstances to suffer a disabling injury." <u>Id.</u> at 18. Satisfying the definition of a qualifying incident is all that is required.

As the PFRS Board did in <u>Russo</u>, the TPAF Board here "went astray" by shifting its focus from the definition of a qualifying event.[1] In support of its finding that petitioner did not experience a terrifying or horror-inducing event, the ALJ relied on her independent views of how a "reasonable teacher" might react:

> In other words, the stressors were not sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances. I cannot conclude that petitioner here experienced a terrifying or horror-inducing event or events that would have caused a reasonable

_____

[1] The majority finds a meaningful distinction between the present case and <u>Russo</u>, insofar as the Board in <u>Russo</u> found that the event was terrifying and horror-inducing, but still failed <u>Patterson</u>. I am unpersuaded. In my view, the ALJ's error mirrors the one the Court corrected in <u>Russo</u>. In both cases, the pension board wrongly incorporated a reasonableness standard into its <u>Patterson</u> analysis.

person in similar circumstances to suffer a disabling mental injury. A reasonable teacher might have found the incident upsetting or disturbing, but being pushed and shoved, or being grabbed by a special education student, would come within the expected scope of incidents a high school physical and health education teacher might experience. And indeed, the history shows that such incidents, while not occurring on a daily basis, occur with sufficient regularity in the classroom setting.

. . . . I CONCLUDE that the events experienced by the petitioner, taken objectively, would not cause a reasonable teacher to become mentally debilitated.

However, as Russo instructs, the Board's task was to apply the Patterson definition, and not formulate conclusions about how "a reasonable teacher" might have reacted.[2]

---

[2] The ALJ apparently misconstrues what I believe the Court means by its reference to a "reasonable person." See Russo, supra, 206 N.J. at 18-19, 24-27, 31-33. The Court is not referring to the "reasonable person" as the hypothetical person who "exercises the degree of attention, knowledge, intelligence, and judgment that society requires of its members for the protection of their own and of others' interests." Black's Law Dictionary 1380 (9th ed. 2009). In that sense, there is no indication that a victim's "reasonableness" has anything to do with whether one actually develops PTSD or whether other similarly situated employees would react the same way. Instead, the Court uses "reasonable person" to capture whether the person's reaction is normal, and not idiosyncratic. This concept may be found elsewhere in our law. See, e.g., N.J.S.A. 2C:12-10 (defining criminal stalking in terms of what a "reasonable person" would fear). A "reasonable person" was not intended to mean the common, typical, or usual person. The fact that a small fraction of employees may develop PTSD, and the overwhelming majority may not, after being exposed to the same horrifying or terrifying incident involving actual or threatened death or
(continued)

Furthermore, the ALJ's conclusion about what a "reasonable teacher" might have found terrifying or horrifying was unmoored to the record. Particularly troubling was her conclusion that the teacher's day-to-day routine should have, to some degree, prepared her for the violent attack.

In this case, petitioner was not a special education teacher, although she was permitted to teach "adaptive physical education," which she described as a class of students with disabilities. There was no evidence she had training or prior experience in coping with assaultive, disabled students. The school denied her request for training in dealing with physically disruptive students. Thus, even applying an

---

(continued)
serious injury, does not make the minority of employees "unreasonable." Even among veterans who faced the horrors of war, the majority reportedly do not suffer PTSD, although the number experiencing the disorder is significant. See Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1227 n.1 (9th Cir. 2010) (citing study that found roughly thirty percent of Vietnam veterans suffered PTSD at some point); see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 276 (5th ed. 2013) ("DSM-V") (stating that "[t]he conditional probability of developing PTSD following a similar level of exposure may . . . vary across cultural groups"). The wisdom of the Court's approach in Patterson and Russo was to rely on accepted psychiatric concepts to set the norm for the "reasonable person."

independent test of "reasonableness," albeit contrary to <u>Russo</u>,

the ALJ's finding lacks sufficient support in the record.[3]

---

[3] The Court in <u>Russo</u> suggested that a petitioner's background and training may be relevant in determining whether he or she suffered a compensable mental disability triggered by a terrifying or horror-inducing event. For example, the Court evidently weighed the fact that Russo was a "newly minted police officer," with no firefighting training, in concluding he was terrified when he was thrust into a house ferociously aflame and was unable to rescue a trapped resident. <u>Russo</u>, <u>supra</u>, 206 <u>N.J.</u> at 34.

It may be true — although there is no supporting record evidence — that training, background, and experience may decrease a petitioner's sensitivity to certain events and, accordingly, the likelihood that he or she will suffer PTSD when exposed to them. But it strikes me that this is a poor proxy for determining whether a qualifying event has occurred. Even assuming a trained firefighter may not be terrified to enter a flaming structure, the training may not shield the firefighter from the terror of being overcome with smoke inhalation, hearing the cries for help of a doomed resident, and absorbing the scorn of the victim's family. I am not convinced that had a firefighter been at Russo's side, experiencing everything Russo experienced, and then also developed PTSD, the firefighter would be ineligible for an accidental disability pension. The employees who are most likely to repeatedly confront horrifying or terrifying incidents as part of their jobs — such as emergency medical personnel, firefighters, police officers and armed forces members — face heightened risks of developing PTSD. <u>See</u> <u>DSM-V</u>, <u>supra</u>, at 276 ("Rates of PTSD are higher among veterans and others whose vocation increases the risk of traumatic exposure (e.g., police, firefighters, emergency medical personnel)."). The fact that horrifying traumatic events may be more common in some occupations than others does not necessarily make them less traumatic or horrifying. Furthermore, the <u>Richardson</u> "unexpected and undesigned" test does not necessarily erect a heightened hurdle for them to obtain an accidental disability pension. Even if a kind of event is not unexpected over the course of a particular worker's career — e.g., an explosion in a bomb squad member's career or a fatal shooting in a police officer's career — and even if a
(continued)

I would also reverse the Board's decision because of the fundamental incongruity in the ALJ's holding that petitioner suffered from PTSD, yet did not experience a terrifying and horror-inducing event under the Patterson test. Since the Patterson test quotes the DSM definition for PTSD, this finding essentially contradicts itself.

In order to reach this odd result, the ALJ's discussion regarding accidental disability minimized the nature of the incident in this case. She did so, first, by downplaying key facts. Second, she misconstrued the hypothetical examples of traumatic events listed in the case law as defining the scope of what constitutes a "terrifying or horror-inducing event."

The ALJ minimized the incident on her way to finding it failed the Patterson test. The record demonstrates that in the third and most terrifying incident, petitioner was not merely "grabbed," as the ALJ states in her legal analysis and conclusion. An angry student confronted her. With the strength to do so, he "yanked" petitioner's arms behind her back, to

(continued)
worker's training is designed to enable the worker to confront such event, the event may still be undesigned and unexpected when it occurs.

quote the ALJ's own statement of the case. The student restrained petitioner's arms behind her back for what felt like "forever," petitioner said, while he loudly threatened to "kick her ass." Petitioner was petrified, terrified, and felt helpless. Then the student let go of petitioner's hands so he could take three swings at her face. That incident, particularly on the heels of the prior physical assaults, was a "terrifying . . . event." Both verbally and physically, the student threatened serious injury. We do not need specific testimony to conclude that had one or more of the three swings landed on petitioner's head, petitioner could have suffered traumatic brain injury, fractures, or sensory damage. See DSM-V, supra, at 424 (including as examples of traumatic events that may trigger PTSD "threatened or actual physical assault" including "physical attack, . . . [and] mugging"). As a direct result of this incident, in the wake of the two prior incidents, petitioner developed PTSD.[4]

The ALJ also erred in attempting to fit petitioner's experience into a procrustean bed of illustrative incidents

---

[4] I recognize that the ALJ found only that the PTSD developed "after" the incident, but did not expressly find that PTSD was a "direct result" of the event. See Richardson, supra, 192 N.J. at 212; N.J.S.A. 18A:66-39(c). However, I would exercise original jurisdiction and find that it was, consistent with testimony of petitioner and her expert, whom the ALJ credited.

described in Patterson and Russo. In particular, the ALJ assigned undue significance to the non-exclusive list of incidents that may warrant crisis intervention services for law enforcement officers under N.J.S.A. 40A:14-196.[5] The Patterson Court found this statute "instructive." Patterson, supra, 194 N.J. at 45. Although the list "reflect[s] the Legislature's general acceptance of the view of the psychiatric community regarding the quality of traumatic event that might be expected to result in a mental injury," the Court recognized that the list was "law-enforcement specific." Id. at 49. Thus, it should not preclude different claims by non-law-enforcement pension members. The Court stated, "[T]he gravamen of that

---

[5] The statute defines such "critical incident[s]" to include:

> the firing of a weapon or an exchange of gun fire; serious bodily injury to or the death of a juvenile; a terrorist act; a hostage situation; serious bodily injury to or the death of another law enforcement officer employed in the same agency, when that serious bodily injury or death occurred in the performance of that officer's official duties; a personal injury or wound; serious bodily injury received in the performance of the officer's official duties; and such other incidents or events as the county crisis intervention services advisory council established pursuant to section 4 of P.L. 1998, c. 148 (C. 40A:14-198) shall deem appropriate.
>
> [N.J.S.A. 40A:14-196.]

statute is that the Legislature has specifically recognized that a traumatic event giving rise to a mental disability, like PTSD, may, but need not, involve physical impact."  Id. at 45.  The Court's examples evidently were intended to be illustrative, but not limiting.  To construe them any other way opens the door to arbitrary or unpredictable applications of the test.

As a result of these errors, the ALJ denied accidental disability while simultaneously finding that petitioner manifested the symptoms of PTSD after the student's assault and that she was "permanently and totally disabled" as "treatment had not been effective in alleviating" those symptoms. Petitioner's expert found she met the DSM criteria for PTSD. Thus, implicit in the ALJ's finding was the conclusion that, consistent with the DSM definition, petitioner suffered her mental disorder because of exposure to a "terrifying or horror-inducing event."  As already noted, the DSM definition of PTSD is the direct source of the Patterson test.[6]  Yet, the ALJ incongruously found that petitioner had not confronted the qualifying mental stressor as defined by Patterson.  While I agree with my colleagues that the Board — not a testifying

_____

[6] While the history of PTSD was the "back drop" of the Patterson Court's analysis, the DSM criteria are more than that.  Except for the insertion of two words of no direct relevance to this case — "similarly serious" — the DSM criteria are imported verbatim into the Patterson test.

expert — determines whether an employee meets the Patterson test, ante at __ (slip op. at 25), the Board must rely on more than its own ipse dixit, particularly when the fact-finder has credited that psychiatric expert.

3.

In closing, I note how far afield the ALJ's reasoning, approved by the Board and the majority, has taken us from the fundamental purpose of an accidental disability pension, and the legislated distinction between disabilities that qualify for an ordinary disability pension and those that qualify for an accidental disability pension.

As the Court noted in Patterson, "The main difference between the two is that ordinary disability need not have a work connection." Patterson, supra, 194 N.J. at 42; compare N.J.S.A. 18A:66-39(c) (providing access to accidental disability if the applicant "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties"), with N.J.S.A. 18A:66-39(b) (requiring only a showing that the applicant is "physically or mentally incapacitated for the performance of duty and should be retired"). The ALJ found that petitioner suffered PTSD, and was thus, in her words, "mentally incapacitated from performing her usual or any other duty."

Petitioner suffered that condition as a direct result of an assault in the workplace. Yet, the ALJ denied her access to an accidental disability pension, concluding instead that she was entitled only to ordinary disability pension benefits.[7]

In doing so, the ALJ also thwarted the historical purpose of accidental disability pensions: to provide an incentive to workers to take on the risks of their work by providing them with the peace of mind that a generous benefit would be available without regard to a prerequisite term of service if they become disabled by a work-related traumatic event. Cf. N.J. Pension Survey Commission, Report No. 4 Recommendations for the Sound Financing of Public Employee Pension Systems in New Jersey 22-23, 30 (1932); compare N.J.S.A. 18A:66-41 (providing TPAF ordinary disability pension and annuity equal to no less than 43.6 percent of final compensation), with N.J.S.A. 18A:66-42 (providing TPAF accidental disability pension and annuity of 72.7 percent of annual compensation); and compare N.J.S.A. 18A:66-39(b) (requiring ten years of service for ordinary disability pension), with N.J.S.A. 18A:66-39(c) (imposing no minimum years of service for accidental disability pension);

_____

[7] Notably, if petitioner had not accumulated ten years of service, she would have been denied a disability pension altogether. See N.J.S.A. 18A:66-39(b).

Robert L. Clark et al., <u>A History of Public Sector Pensions in the United States</u> (2003).

In sum, I would reverse the Board's decision and order the award of an accidental disability pension. For that reason, I respectfully dissent.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION