**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1861-22

DAVID KOZAK,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Submitted October 2, 2024 – Decided January 9, 2025

Before Judges Mayer and Puglisi.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx1229.

Fusco & Macaluso, PC, attorneys for appellant (Amie E. DiCola, on the brief).

Nels J. Lauritzen, Deputy Director of Legal Affairs, attorney for respondent (Thomas R. Hower, Staff Attorney, on the brief).

PER CURIAM

Petitioner David Kozak appeals from the January 12, 2023 final administrative decision of the Board of Trustees (Board) of the Police and Firemen's Retirement System (PFRS), denying his application for accidental disability retirement benefits (ADRB). We affirm.

Petitioner was employed by the New Jersey Department of Corrections (DOC) as a Corrections Sergeant at Northern State Prison. He began working for the DOC in 2005 and was assigned to at least three different prisons since that time. As part of petitioner's job, he supervised the movement and transfer of inmates throughout the prison.

In January 2016, based on a comment petitioner made to a coworker that he would "kill anyone who would hurt his family," the DOC placed petitioner on administrative leave pending a psychological evaluation. Petitioner claimed the comment was not directed at the coworker and he made the comment in response to a threatening note left on his car. On multiple occasions, petitioner reported to the DOC and the police his perceived harassment by coworkers, citing his national origin and position of authority as possible motivating factors for the harassment.

Petitioner underwent a fitness for duty examination conducted by Dr. Dennis H. Sandrock, a psychologist. Dr. Sandrock recommended petitioner be relieved from work and seek treatment from a mental health professional. At that time,

petitioner began psychotherapy treatment with Dr. Jeffrey Schreiber, who diagnosed him with generalized anxiety disorder. Dr. Schreiber reevaluated petitioner and cleared him to return to work as of May 2016.

Approximately six weeks after his return to work, on July 6, 2016, petitioner was monitoring the movement of inmates when he heard another officer tell an inmate, "Get back, get back." Petitioner walked toward the officer to investigate and "was struck repeatedly by the inmate on the head." Although petitioner testified that "after the first punch everything went dark," based on his review of surveillance footage, petitioner observed he was hit between seven and ten times by the inmate. While attempting to subdue the inmate, responding officers threw petitioner out of the way, slamming his body into a metal podium and wall.

Petitioner was taken to the hospital by ambulance. He was monitored at the hospital overnight before leaving against medical advice the following day because he felt unsafe there.

Following the assault, petitioner was out of work for approximately nine months and received worker's compensation benefits. Through worker's compensation, he began seeing Dr. Syed A.R. Zaidi, a psychologist, with whom he continued to treat. He also saw Dr. Rafael Levin for orthopedic injuries to his back. After six months of physical therapy, Dr. Levin cleared petitioner orthopedically to

A-1861-22

return to work with no restrictions in October 2016.  However, Dr. Zaidi did not clear petitioner psychologically to return to work until April 7, 2017.

A short while after petitioner's return, Dr. Zaidi took him out of work after he expressed suicidal thoughts; he did not return to work.

Between August 8, 2017 and November 21, 2018, petitioner filed for ADRB eight times.  His last application for ADRB alleged:

> Applicant is permanently and totally disabled with orthopedic disability inclusive of multilevel spinal injury.  Applicant is also permanently and totally disabled with psychiatric disability. . . . his disability is the direct result of the July 6, 2016 violent physical assault on applicant that occurred during the performance of his regular or assigned duties as a Sergeant of Corrections.

On January 16, 2019, the Board denied petitioner's claim for orthopedic ADRB, citing a lack of evidence his injuries were directly caused by the inmate assault.  The Board found petitioner totally and permanently disabled on a psychological basis and awarded him ordinary disability retirement benefits (ODRB).  However, it denied petitioner's claim for psychological ADRB, finding petitioner's medical records indicated his disability was the result of his "underlying paranoid delusional disorder," not the inmate assault.  Further, the Board did not find the inmate assault constituted a "terrifying or horror-inducing event" or met the reasonable person standard required by state law.

4

Petitioner appealed the denial of orthopedic and psychological ADRB, and his case was transmitted to the Office of Administrative Law as a contested case.

Petitioner testified as to the inmate assault, its effect on his mental and physical health, and multiple incidents of perceived harassment. Regarding his orthopedic complaints, petitioner testified he "did not receive any adequate care" and "almost had no treatment for any orthopedic injuries." While petitioner complained about his head, neck, and pain going down his arms, he testified the doctors sent him for "treatment for [his] lower back." He claimed he "fe[lt] like there's a building on my back . . . that's always there."

Petitioner also testified that his January 2016 administrative leave occurred because he "was just stressed" after finding a harassing note on his car. Petitioner asserted he had been harassed since he attended the corrections academy and, despite reporting these incidents to the DOC and the police, he claimed no action was ever taken "because it was my word against [theirs]."

Petitioner further characterized his return to work after the assault as "the most disturbing six weeks of [his] life." Describing the shift in his mental health condition before and after the inmate assault, petitioner testified:

> It's completely different. I mean I was stressed, I was angry, I mean harassment is something serious. Throwing paint on my vehicle, waking up in the morning, with paint on your vehicle is aggravating . . .

but there w[ere] no flashbacks, I didn't have any sweats. It was more—it made me more actually determined to go back to work and do my job even better.

Petitioner testified that he became suicidal, which caused Dr. Zaidi to remove him from his job again in May 2017. Petitioner never returned to work.

Dr. John Handago, qualified as an expert in general orthopedics, testified on petitioner's behalf. Petitioner sought treatment with Dr. Handago in June 2021, complaining of cervical spine and neck pain from a work injury. Dr. Handago examined petitioner, finding "injury to the cervical spine where his cervical discs were compromised and perhaps herniated causing him to have deficiencies of motor function, reflexes, and sensation." Further, Dr. Handago testified "manual testing" revealed petitioner's reflexes "were almost absent" on his bilateral biceps, but normal in his triceps. Dr. Handago also testified a qualitative assessment revealed "noticeable weakness of his grip strength or finger flexion of his right hand."

Dr. Handago was unable to recall the documentation presented to him at the time but testified he "probably" reviewed petitioner's hospital records. He testified petitioner had "at least one cervical disc herniation if not more," "[wa]s totally and permanently disabled from the performance of his regular and assigned duties as a corrections officer," and "cannot function properly in control of a firearm or handgun." On cross-examination, Dr. Handago admitted he was "relying on the

6

patient and [he] asked [petitioner] basically the mechanism of how he got hurt regarding his cervical spine."

Dr. Schreiber, qualified as an expert in clinical psychology, also testified on petitioner's behalf. Dr. Schreiber began seeing petitioner in February 2016, at which time petitioner was experiencing a "tremendous amount of stress, anxiety . . . primarily . . . related to his work and what was going on there. He . . . had felt harassed by some people at work." Initially, Dr. Schreiber diagnosed petitioner with generalized anxiety disorder. He testified that he hoped through therapeutic treatment "to understand as much as possible the roots of [petitioner's anxiety] . . . which to a large extent derived from the work situation." In describing petitioner's mental state after starting treatment, Dr. Schreiber testified petitioner "made significant improvement," his anxiety was "alleviated to a significant extent," and he "wanted to get back to work."

Dr. Schreiber then testified as to petitioner's mental state following the inmate assault, characterizing it as "a different ball game" and "unlike what happened before." Dr. Schreiber testified that, after the assault, petitioner's symptoms met the criteria for a diagnosis of "generalized anxiety disorder compounded by post-traumatic stress disorder [(PTSD)]." Specifically, he testified:

> Well, I think what happened after this . . . assault
> represented a qualitative change. I saw . . . a level of

anxiety and distress unlike what I had seen before.  It was qualitatively different. . . . he had flashbacks.  He had recurrent dreams.  He had persistent thoughts about . . . what had happened.  He had nightmares . . . over and over again.  He . . . was very worried that an . . . assault might happen again which is very common when you experience like that, you're constantly keyed up.  You're on edge.  You're . . . you're thinking, if not assuming, but you're certainly consider[ing] the possibility that this is going to happen again.  And so you're hyper vigilant.

In differentiating general anxiety disorder from PTSD, Dr. Schreiber said, "People who have PTSD are also anxious, among other things, but at a whole different level and a way that impairs their functioning much differently."  Dr. Schreiber did not diagnose petitioner with PTSD prior to the assault and opined his PTSD was "definitely" caused by the inmate assault.  He further found no evidence petitioner had paranoid delusional disorder (PDD), citing Dr. Sandrock's clearing petitioner's return to work.

Dr. Richard A. Filippone, qualified as an expert in clinical psychology, was engaged by PFRS to conduct an independent medical examination on petitioner.  He examined petitioner on June 6 and 13, 2018, during which he administered self-report tests for depression and anxiety, which showed "severe" levels of depression and anxiety.  In addition to his examination of petitioner, Dr. Filippone reviewed

medical records, requested additional medical records, and ultimately prepared a report and several addenda before reaching a diagnostic conclusion.

Dr. Filippone testified he diagnosed petitioner with PDD, but believed petitioner "was disabled from the time he went out of duty [in January 2016] all the way to the present time." He further testified he did not conclude petitioner's mental health issues were caused by the inmate attack because he believed petitioner's PDD symptoms began around November 2014. Dr. Filippone testified, "[Y]es, he has anxiety. He has depression. But what is really restricting him is not any of that. What's really restricting him from doing his job are paranoid delusional beliefs."

Dr. Richard Rosa, qualified as an expert in orthopedics and orthopedic surgery, also testified on behalf of PFRS. Dr. Rosa examined petitioner on May 4, 2018, after which he prepared a report and addendum. Dr. Rosa's examination of petitioner's back and neck were both "unremarkable." Having reviewed petitioner's hospital records from the assault, Dr. Rosa testified the physical examination performed on petitioner's neck and back in the emergency room were normal. According to Dr. Rosa, these records indicated petitioner suffered chest pain, loss of consciousness, diabetes, uncontrolled blood pressure, and a hypo-coagulable state. Dr. Rosa testified the hospital's CT scan of petitioner the day of the assault showed no evidence of cervical spine fracture or subluxation. He noted petitioner's January

9

2018 MRI showed positive findings associated with progressive degenerative changes of the spine and were not necessarily traumatically induced.

After hearing testimony for five days, the ALJ issued her initial decision on November 17, 2022. She found petitioner credible when testifying about his mental health but deemed his recitation of some incidents "farfetched and unlikely to have occurred as [he] described them." She also found his testimony concerning his back and neck pain not credible and "exaggerated," nor did she find convincing his assertion that he experienced "flashbacks, panic attacks, and other alleged symptoms of PTSD that made it impossible for him to work" after the inmate assault.

Regarding the competing psychological expert testimony, the ALJ found "the scales tip in favor of Dr. Filippone" because he "performed a thorough evaluation of [petitioner], conducted a comprehensive review of [his] medical records, and his testimony was clear and persuasive." In contrast, she found Dr. Schreiber "testified very generally[] and lacked specificity," and he was "vague and unclear concerning the bases for his opinions, and he was unclear about what, if any records he reviewed prior to issuing his reports/letters." She concluded Dr. Filippone's opinions were more persuasive regarding the substantial direct cause of petitioner's psychological disability and afforded his opinions more weight.

Regarding the competing orthopedic expert testimony, the ALJ found Dr. Rosa's testimony more persuasive and gave it greater weight because it was consistent with the hospital records, finding no evidence of neck or back trauma. Dr. Rosa's findings were also consistent with those of Dr. Levin, who cleared petitioner to return to work without restrictions in 2016. In contrast, she found Dr. Handago's opinions "questionable" and less reliable because his review of the medical records was limited and his evaluation was conducted five years after the alleged injury.

Based on these findings, the ALJ determined there was "insufficient objective evidence in the record of a total and permanent orthopedic disability involving [petitioner's] neck or back," and therefore petitioner was "unable to demonstrate direct causation of an orthopedic disability" necessary to establish his entitlement to ADRB on an orthopedic basis.

The ALJ further found petitioner failed to satisfy the threshold requirement that the July 2016 attack was a "terrifying or horror-inducing event that involve[d] actual or threatened death or serious injury." After receiving an initial punch by the inmate, petitioner "was out" and did not recall anything else; his "recollection of the events that day was poor, and he did not testify how this assault was terrifying or horror-inducing." The ALJ also noted petitioner was surrounded by corrections officers who were able to assist him, and therefore she was not convinced the

incident involved a true threat of death or serious injury. The ALJ further determined that, even if petitioner had met the threshold requirements, his claim for psychological ADRB nevertheless failed because he did not establish that his psychological disability was the direct result of the incident.

Therefore, the ALJ affirmed the Board's decision denying petitioner ADRB and awarding him ODRB based on his psychological condition, and denied his appeal to overturn that determination. On January 12, 2023, after reviewing the record and petitioner's exceptions, the Board issued its final administrative determination adopting the ALJ's decision in its entirety.

On appeal, petitioner argues the Board's decision was arbitrary, unreasonable, capricious, and not supported by substantial credible evidence in the record.

Judicial review of quasi-judicial agency determinations is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). An agency's final quasi-judicial decision on the merits "will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs. of the Police & Firemen's

Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo, 206 N.J. at 27). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, "a reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)). Rather, the judicial role in reviewing administrative action is generally limited to the following inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto. Grp., 234 N.J. at 157 (quoting Stallworth, 208 N.J. at 194).]

To determine whether an agency's decision is supported by substantial evidence, we may not "engage in an independent assessment of the evidence as if it were the court of first instance." In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). We must consider only "'whether the

findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 92-93 (1973) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." In re Application of Hackensack Water Co., 41 N.J. Super. 408, 418 (App. Div. 1956) (citations omitted).

Moreover, "[a]n administrative agency's interpretation of a statute it is charged with enforcing is entitled to great weight." Piatt v. Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (quoting In re Eligibility of Certain Assistant Union Cnty. Prosecutors to Transfer to PFRS under N.J.S.A. 43:16A-1 et seq., 301 N.J. Super. 551, 561 (App. Div. 1997)). "This deference comes from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010) (citing Kasper v. Bd. of Trs. of the Tchrs.' Pension & Annuity Fund, 164 N.J. 564, 580-81 (2000)).

The PFRS pension plan grants ADRB if the member is

> permanently and totally disabled as a direct result of a
> traumatic event occurring during and as a result of the

performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

[N.J.S.A. 43:16A-7(a)(1).]

A claimant seeking ADRB must prove five elements:

1) that he is permanently and totally disabled;

2) as a direct result of a traumatic event that is

   a) identifiable as to time and place,

   b) undesigned and unexpected, and

   c) caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3) that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4) that the disability was not the result of the member's willful negligence; and

5) that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 212-13 (2007); N.J.S.A. 43:16A-7(a)(1).]

15

In addition to these elements, a petitioner seeking ADRB based on a permanent mental disability must first show that the disability resulted "from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 34 (2008). Additionally, the event must be "not inconsequential but . . . objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Ibid.

Here, it is undisputed petitioner is permanently and totally disabled on a psychological basis and that the July 2016 inmate assault occurred during and as a result of the performance of his regular, assigned duties. Petitioner argues the Board erred by determining the inmate attack was not "a terrifying or horror-inducing event," and that his disability was not the "direct result" of that event. We disagree.

Our Supreme Court identified events that would meet this threshold, which include a "policeman who sees his partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant." Patterson, 194 N.J. at 50. Further, "a police officer—neither trained nor equipped to confront a major fire—who was ordered into a burning house to rescue the residents" and

subsequently suffered from PTSD met the benchmark. Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 424 (2018) (citing Russo, 206 N.J. at 19).

In contrast, a teacher who was assaulted by special needs students on three occasions was denied ADRB despite a PTSD diagnosis. Thompson v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 449 N.J. Super. 478 (App. Div. 2017). The ALJ there found those incidents "although undoubtedly distressing, did not constitute a terrifying or horror-inducing event in line with the examples given by the Patterson Court." Id. at 497. We agreed the petitioner in Thompson failed to meet the Patterson threshold, in part because she "was accompanied by teacher's aides who quickly assisted petitioner in removing the student." Id. at 494.

Here, we find unavailing petitioner's request we "shed" our deferential standard of review of administrative agency determinations. Having reviewed the record, we discern no reason to disturb the Board's determination that the assault on petitioner was not a terrifying or horror-inducing event that involved actual or threatened death or serious injury. As the ALJ articulated, petitioner did not independently recall the majority of the incident, during which he was surrounded by other corrections officers who could have protected him from further assault.

Contrary to his assertions, the ALJ did not find petitioner was "suffering from nothing." Rather, she found "the preponderance of the evidence demonstrates that

[petitioner] has [PDD] that pre-dated the July 2016 incident, and that this is the cause of his current disability." Her conclusion is supported by Dr. Filippone's credible testimony and report, which also referenced Dr. Sandrock's fitness for duty report, which was written before the assault. Thus, the ALJ's decision is firmly grounded in the record.

As to petitioner's claim for orthopedic ADRB, petitioner contests the ALJ's credibility findings and argues she should have found the testimony in equipoise, in support of his application. We are satisfied the ALJ's credibility determinations were fully supported by the record. She accorded more weight to the experts she found to be more thorough, precise and persuasive. She also considered the competing testimony against the objective evidence contained in petitioner's medical records and gave due weight to the testimony consistent with those records.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1861-22